673 A.2d 259

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL
P. MEGARGEL, DEFENDANT–RESPONDENT.

Argued November 27, 1995—Decided March 27, 1996.

486

*Teresa M. Burzynski,* Acting Assistant Prosecutor, argued the cause for appellant (*Joseph F. Audino,* Acting Camden County Prosecutor, attorney).

*Dennis Wixted* argued the cause for respondent (*Sufrin Zucker Waller & Wixted,* attorneys; *Mr. Wixted* and *Jeffrey C. Zucker,* of counsel and on the brief).

*Carol M. Henderson,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

*Mark H. Friedman,* Assistant Deputy Public Defender, argued the cause for *amicus curiae* Public Defender (*Susan L. Reisner,* Public Defender, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

*N.J.S.A.* 2C:44–1f(2) (section 44–1f(2)) provides that where a sentencing court is clearly convinced that the mitigating factors outweigh the aggravating factors *and* the interest of justice demands, a court may sentence a defendant who had been convicted of a first or second degree crime to a term appropriate to an offense one degree lower. In this appeal, we must determine

whether the court properly applied section 44–1f(2) when it sentenced defendant, convicted of first-degree kidnapping, as if he had been convicted of second-degree kidnapping. Most particularly, we must consider whether the court properly found that the second statutory requirement of section 44–1f(2), that "the interest of justice" demands a downgrade, was met.

## I

Around 1:00 a.m., Daniel Harris, the victim, was walking to his girlfriend's house in Camden, when a white four-door Dodge stopped him in the middle of the street. Harris testified that four men exited the vehicle, shouting "Freeze, Police!" Harris explained that three of the men approached him, but that a white male with blond hair, later identified as defendant, Michael P. Megargel, stayed by the car. Megargel was the only Caucasian in the group. All of the men, except Megargel, wore hoods. According to Harris, three of the men carried police-type badges, a man later identified as co-defendant Lamont Lee carried a silver-colored .357 magnum and Megargel carried a laser-sighted 12-gauge pump action shotgun.

Harris provided the following account of the incident: After being stopped by the four men, an altercation ensued in which Lee struck Harris in the head with the .357 magnum, and Megargel struck Harris with the shotgun. The four men handcuffed Harris and told him he was under arrest. The group then placed Harris in the white four-door Dodge, all the while continuing to beat him. Following the directions of Lee, Megargel drove the car to a vacant lot near the Benjamin Franklin Bridge. The men dragged Harris out of the car and threw him to the ground. Megargel shined a laser sight from the shotgun in Harris' eyes. Lee then removed the victim's handcuffs and fired two shots near Harris' head. The men removed his clothing and continued to beat him. The assailants finally left after Harris feigned unconsciousness.

Harris was able to identify the license plate number of the white four-door Dodge and reported this information to the authorities

immediately following the incident. Merchantville police spotted the car and stopped it. Megargel was driving and Lee was the passenger. They were the only occupants. The police found that Lee was carrying a .357 magnum revolver with hollow-nose bullets. Also in Lee's possession were two Department of Corrections badges, a Department of Corrections identification card, a handgun purchaser's permit, handguns and two live 12-gauge shotgun shells. In the car's trunk, the police uncovered a fully loaded 12-gauge pump action shotgun with laser sight and two winter coats. On Megargel, the police found a set of keys, including a handcuffing key and a $20.00 bill. Harris identified the two as participants in the robbery and kidnapping. He also identified the car as the one used by the robbers and kidnappers and identified one of the winter coats in the car's trunk as his.

On July 31, 1991, Lee and Megargel were indicted for first degree kidnapping, *N.J.S.A.* 2C:13–1b(1); first-degree robbery, *N.J.S.A.* 2C:15–1; possession of a firearm for an unlawful purpose, *N.J.S.A.* 2C:39–4a; unlawful possession of a handgun, *N.J.S.A.* 2C:39–5b; possession of hollow nose bullets, *N.J.S.A.* 2C:39–3f; second-degree aggravated assault, *N.J.S.A.* 2C:12–1b(1); unlawful possession of a shotgun, *N.J.S.A.* 2C:39–5c(1); and conspiracy to commit first-degree robbery, *N.J.S.A.* 2C:5–2 and 2C:15–1.

At the commencement of the jury trial, the trial court granted the State's motion to dismiss count four (possession of hollow nose bullets) as to Megargel, and counts four and six (unlawful possession of a shotgun) as to Lee. The trial court also granted the state's motion to amend count one, robbery with a handgun, to "and/or a shotgun."

At trial, several facts became known. First, the .357 magnum and shotgun had been purchased by Lee before the robbery and kidnapping. Second, Lee was employed at the Wagner Correctional Facility at Bordentown as a Senior Corrections Officer. Lieutenant George Price testified that the badges were assigned to Lee and that the identification and weapons card also belonged to Lee. The Lieutenant added that Lee was not qualified to carry

firearms. An employee of defendant's father testified that on the night of the incident, he saw Megargel at about 10:00 p.m. at the Mobil Station where Megargel was employed. The employee testified that Megargel was showing off a police badge and then got into a white car. A former friend of Megargel, Gary Meyer, testified, pursuant to a plea bargain, that Megargel had told him about his involvement in the incident of assault and robbery on Harris.

Both defendants testified at trial. Lee asserted an alibi defense. He alleged that he had been dropped off at an old girlfriend's house in Camden and was not in the car when Harris was attacked. After the incident, he was picked up at his friend's house around 2:05 a.m. Megargel was driving. They dropped off Lee's brother and were heading back to the Mobil Station when they were suddenly pulled over by the police.

Defendant, Megargel, testified that he was working at the Mobil station on February 24, 1992 from five in the afternoon until midnight. While Megargel was working, Lee came to visit another Mobil station employee, Bruce Black. After spending some time at the station, Lee announced that he was going to Camden and Megargel asked if he could accompany him. Megargel testified that he believed that Lee was a police officer and thought it would be "cool" to go for a ride with him. The two borrowed Black's car and drove to Camden where they were later joined by some of Lee's friends.

Megargel testified that the group drove through Camden, stopping people on the street and stealing their money. Megargel maintained that he had no idea that the group was going to engage in such activities. However, because all of the men had guns, he claimed he was afraid to attempt to leave the group. Megargel further asserted, throughout his testimony, that although he was present for the attack on Harris, he never got out of the car, never had a shotgun and never hit or beat Harris. He insisted that he did not participate in the incident and that he wanted to leave but was afraid to because all of the men carried

weapons. Megargel called thirteen character witnesses who testi-
fied to his good character. At the time of sentencing, several of
these witnesses, as well as others, wrote letters on Megargel's
behalf.

The jury convicted Lee of all charges. However, the jury
convicted Megargel of only first-degree kidnapping, acquitting him
of all other charges. Pursuant to *N.J.S.A.* 2C:43–6d, the trial
court conducted a Graves Act Hearing and concluded that the Act
applied to both defendants. The trial court concluded that the
Graves Act applied to Megargel for first-degree kidnapping and to
Lee, for first-degree robbery, possession of a firearm for an
unlawful purpose and aggravated assault.

The trial court sentenced Lee to twenty-seven years, nine
without parole for the first-degree kidnapping and a consecutive
five year sentence for unlawful possession of a handgun. He also
was sentenced on the armed robbery conviction to an eighteen
year prison term, with a six year parole disqualifier to run
concurrent with the other sentences imposed. The trial court
merged all of Lee's other convictions into his conviction for first-
degree robbery. Lee received an aggregate sentence of thirty-
two years, nine without parole.

In imposing sentence on defendant, the court observed that
Megargel had been acquitted on all charges except first-degree
kidnapping. The court further observed that, although Megargel
could be vicariously liable for crimes of an accomplice, he could not
be liable for aggravating factors not personal to him. (citing *State
v. Rogers,* 236 *N.J.Super.* 378, 565 *A.*2d 1128 (App.Div.1989) *aff'd,*
124 *N.J.* 113, 590 *A.*2d 234 (1991)).

The trial court remarked that the jury accepted a different view
of Megargel's role in the incident than the victim, Daniel Harris,
portrayed in his testimony. Consequently, the trial court conclud-
ed that it could not weigh the factors as if defendant had been
convicted of all the offenses for which he was, in fact, found not
guilty.

Viewing the kidnapping component separately, the trial court concluded that aggravating factor (1) (nature and circumstances of the offense) did not apply to Megargel. The court explained that this factor applied to Lee, because the armed robbery and assault were conducted in an "especially cruel, depraved manner." Acknowledging that the Legislature views kidnapping as an especially serious first-degree offense, the court nonetheless found only aggravating factor (9) (the need to deter) applicable to defendant.

The court, however, found that the following mitigating factors applied to defendant: (1) he had no prior history/criminal record; (2) his conduct was the result of circumstances unlikely to recur; (3) his character and attitude indicated that he is unlikely to commit another offense (the sentencing court also found that defendant had an "impressive array of letters" written on his behalf which all characterized him as "young, impressionable, trusting and naive"); (4) he would respond favorably to probationary treatment; (5) his willingness to cooperate with law enforcement; and (6) his conduct was substantially influenced by another person more mature than defendant.

The trial court observed that it believed that defendant was neither aware that a kidnapping was going to occur the night of the incident nor did he think that it "would evolve into something as severe as it did." The trial court surmised that Megargel was the "least determinative factor of what was going on in those circumstances."

Finding that it was "clearly convinced" that the mitigating factors "substantially outweighed" the aggravating ones and that the "interest of justice required it," the trial court sentenced Megargel as if he were convicted of second-degree kidnapping, a crime one degree lower than that for which he had been convicted pursuant to *N.J.S.A.* 2C:44–1f(2). The trial court imposed a seven year term with a three year parole disqualifier.

The State appealed Megargel's sentence, arguing that the trial court abused its discretion in downgrading Megargel's sentence to a second-degree offense. Megargel cross-appealed, arguing that

the trial court erred in concluding that the Graves Act applied to him. The Appellate Division unanimously affirmed the trial court's findings that the Graves Act applied to Megargel. *State v. Megargel*, 278 *N.J.Super.* 557, 651 *A.*2d 1051 (1995). However, the Appellate Division was divided with respect to whether section 44–1f(2) had been properly applied. A majority of the Appellate Division affirmed the downgraded sentence imposed by the trial court. Judge Keefe dissented. 278 *N.J.Super.* at 568–573, 651 *A.*2d 1051.

The majority of the Appellate Division viewed the issue to be whether the trial court abused its discretion. The dissenting judge more properly viewed the issue to be whether the trial court had applied the correct legal principles. After reviewing the findings of the trial court, Judge Keefe determined that the trial court had misconstrued the meaning of *N.J.S.A.* 2C:44–1f(2) and failed to consider that the "severity of the crime is now the most single important factor in the sentencing process." *Megargel, supra,* 278 *N.J.Super.* at 569, 651 *A.*2d 1051 (citing *State v. Hodge,* 95 *N.J.* 369, 379, 471 *A.*2d 389 (1984)). Further, Judge Keefe remarked that the sentencing judge failed to identify what led to the conclusion that the "interest of justice" demanded sentencing defendant as if he were convicted of a crime one degree lower. *Id.* at 572, 651 *A.*2d 1051. The State filed this appeal on the basis of the dissent in the Appellate Division. *R.* 2:2–1(a)(2).

## II ...

The role of appellate courts in reviewing sentences is to determine: (1) whether the exercise of discretion by the sentencing court was based upon findings of fact grounded in competent, reasonably credible evidence; (2) whether the sentencing court applied the correct legal principles in exercising its discretion; and (3) whether the application of the facts to the law was such a clear error of judgement that it shocks the conscience. *State v. Roth,* 95 *N.J.* 334, 363–65, 471 *A.*2d 370 (1984). A reviewing court may not substitute its own judgement for that of the sentencing

court. *Id.* at 365, 471 *A.*2d 370. Judges who exercise discretion and comply with the principles of sentencing remain free from the fear of "second guessing." *Ibid.*

In *Roth, supra,* 95 *N.J.* at 364, 471 *A.*2d 370, we held that "in [the] context of appellate review of sentencing ... [the court must] determine whether [the] [aggravating and mitigating] factor were based upon competent credible evidence in the record." Several cases following *Roth* have held that the existence of aggravating and mitigating factors must be supported by "competent, reasonably credible evidence." *See State v. Pillot,* 115 *N.J.* 558, 564, 560 *A.*2d 634 (1989); *State v. Jarbath,* 114 *N.J.* 394, 404, 555 *A.*2d 559 (1989); *State v. Sainz,* 107 *N.J.* 283, 292, 526 *A.*2d 1015 (1987); *State v. Morgan,* 196 *N.J.Super.* 1, 5, 481 *A.*2d 545 (App.Div.) *certif. den.* 99 *N.J.* 175, 491 *A.*2d 682 (1984).

■ Reviewing the sentence imposed on defendant, we find that the trial court's findings of mitigating and aggravating factors were based on competent credible evidence in the record. We also find that the court accurately weighed those aggravating and mitigating factors. *See N.J.S.A.* 2C:44–1(a) and (b) (listing the aggravating and mitigating factors a sentencing judge may consider in imposing sentence on a defendant).

We do not dispute the correctness of the trial court's findings of the mitigating and aggravating factors. Nor do we dispute that the mitigating factors substantially outweighed the aggravating factors. Thus, the first statutory requirement of section 44–1f(2) was met. Rather, the dispute centers on whether the second requirement was met, namely, whether the interest of justice demanded the downgrade.

## III

*N.J.S.A.* 2C:44–1f(2) states in pertinent part:

In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the

defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.

This court has held that "[i]f the statute is clear and unambiguous on its face and admits only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). The plain language of the statute makes it clear that for a sentence to be downgraded, a two-step test must be satisfied. The sentencing judge must be (1) clearly convinced that the mitigating factors substantially outweigh the aggravating factors and (2) the interest of justice must demand the downgrade. Section 2C:44–1f(2).

That position is supported by the legislative history. New Jersey Criminal Law Revision Commission originally adopted 2C:43–11, entitled "Reduction of Conviction by Court to Lesser Degree of Offense." Adopting the "unduly harsh" standard found in the Model Penal Code § 6.12, (entitled "Reduction of Conviction by Court to a Lesser Degree of Felony or to a Misdemeanor"), the Commission drafted the following provision:

If, when a person has been convicted of an offense, the Court, having regard to the nature and circumstances of the offense and to the history and character of the defendant, is of the view that it would be *unduly harsh* to sentence the offender in accordance with the Code, the Court may enter judgement for a lesser included offense and impose sentence accordingly. [*The New Jersey Penal Code, Vol. I: Report and Penal Code, Final Report of the New Jersey Criminal Law Commission*, 323 (1971) (emphasis added)].

The commentary to *N.J.S.A.* 2C:43–11 explained that "it is inevitable that cases will arise where a conviction and a disposition in accordance with the Code will seem unduly harsh to those responsible for its administration." *New Jersey Penal Code, Vol. II: Commentary, Final Report of the New Jersey Criminal Law Commission*, 323(1) (1971). The commentary stated that the "powers of reduction are both necessary and desirable features of a system of sentencing." *Id.* at 323(2). Like the Model Penal Code, *N.J.S.A.* 2C:43–11 required the Court to determine whether a particular sentence was fair by reviewing the nature and circumstances of the offense and the history and character of the

defendant. Similar to the Model Penal Code, the New Jersey provision originally adopted a one step "unduly harsh" test to evaluate whether the presumptive sentence was the correct one under the circumstances. However, the final version of the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to 98–4 (the Code), did not include *N.J.S.A.* 2C:43–11.

The Legislature rejected a one step test and instead adopted section 44–1f(2), which requires that the sentencing court satisfy a two prong test. The court must be "clearly convinced that the mitigating factors substantially outweigh the aggravating ones *and* that the interest of justice demand a downgraded sentence." *N.J.S.A.* 2C:44–1f(2).

Unfortunately, however, neither the legislative history nor the plain language of the statute provide any insight to the meaning of the phrase "in the interest of justice," nor does the language of the statute suggest those circumstances under which a downgraded sentence would be appropriate. The definitional section of the Code, *N.J.S.A.* 2C:1–14, fails to define the phrase "in the interest of justice." Five other sections of the Code also fail to define the phrase. *See N.J.S.A.* 2C:1–3f (dismissing or holding in abeyance a pending charge "where it appears that such action is in the interests of justice"); *N.J.S.A.* 2C:20–21b (authorizing the Superior Court to enter injunctions or "take other actions as are in the interest of justice"); *N.J.S.A.* 2C:43–6.2 (providing probationary sentence for first time Graves Act offender if mandatory term "does not serve the interests of justice"); *N.J.S.A.* 2C:43–6.3 (resentencing of Graves Act offender where the "prosecutor agrees that the sentence under review does not serve the interests of justice"); *N.J.S.A.* 2C:104–7c (providing additional payment for material witness in confinement "when the interests of justice require.")

Case law, however, offers some guidance concerning what a court should consider in determining whether a defendant's sentence should be downgraded under section 44–1f(2). In *State v. Jones,* 197 *N.J.Super.* 604, 485 *A.2d* 1063 (App.Div.1984), defen-

dant, an accounts-payable manager for Canadian Fur Trapper Corporation, embezzled over $720,000 from the corporation. *Id.* at 606, 485 *A.*2d 1063. The defendant pled guilty to second-degree theft by deception pursuant to a plea bargain. *Id.* at 605, 485 *A.*2d 1063. In exchange for the guilty plea, the state agreed to recommend a period of imprisonment not to exceed five years along with restitution. *Id.* at 605–06, 485 *A.*2d 1063. The sentencing judge decided that the defendant should be sentenced as if convicted of a third-degree crime pursuant to section 44–1f(2). *Id.* at 606, 485 *A.*2d 1063. In determining the sentence, the trial court noted a number of mitigating factors including: defendant's conduct caused no serious harm; employer's conduct aided the perpetration of the crime; no prior record; conduct was the result of circumstances unlikely to occur again; unlikely to commit another offense; and extensive imprisonment would be unduly excessive. *Ibid.* The trial court also found three aggravating factors to exist: serious offense in which defendant caused her employer to suffer great financial loss; defendant took advantage of a position of trust; and the need to deter. *Id.* at 607, 485 *A.*2d 1063. Weighing all of the factors, the court sentenced defendant to five years probation, 364 days in the county jail and payment of restitution. *Ibid.*

Reviewing the sentence imposed by the trial court, the Appellate Division determined that the trial court improperly weighed the aggravating and mitigating factors and failed to focus on the seriousness of the offense. *Ibid.* The *Jones* court explained that the trial court "never dealt with the important question of whether the interests of justice demanded a downgrade." *Ibid.* The Legislature has mandated that the amount of money taken by the defendant, explained the court, results in a crime of the second degree. *Ibid.* The Appellate Division held that this mandate "should be followed in the absence of some compelling reason to the contrary." *Ibid.* Finding no such reason, the Appellate Division reversed and remanded for resentencing. *Id.* at 609, 485 *A.*2d 1063. Accordingly, downgrading of a defendant's sentence

under section 44–1f(2) should not occur absent "some compelling reason." *Jones, supra,* 197 *N.J.Super.* at 607, 485 *A.*2d 1063.

Further, the Appellate Division has held that "trial courts should be cautious in imposing downgraded sentences" in those cases in which the Legislature had attached an enhanced penalty for a particular offense. *State v. Mirakaj,* 268 *N.J.Super.* 48, 51, 632 *A.*2d 850 (1993). In *Mirakaj,* the court held that, despite the fact that the mitigating factors outweighed the aggravating ones, the interest of justice did not demand that a defendant who pled guilty to aggravated manslaughter (a first-degree crime) be sentenced as a second-degree offender pursuant to section 44–1f(2). *Id.* at 50, 632 *A.*2d 850. The court noted that the Legislature established a more severe punishment for aggravated manslaughter than for other first-degree offenses. (Aggravated assault carries a maximum term of thirty years with a twenty year presumptive term, while other first-degree offenses carry a twenty year maximum with a fifteen year presumptive term). *Ibid.* The court concluded that the Legislature determined that aggravated manslaughter was a particularly serious crime. *Id.* at 50–51, 632 *A.*2d 850. Thus, the court explained, trial courts should exercise caution in imposing downgraded sentences for aggravated assault. *Id.* at 51, 632 *A.*2d 850.

## IV

So, what *is* meant by the phrase "in the interest of justice?" We do not agree with Judge Keefe, who argues that the "in the interest of justice" analysis should be similar to the "in or out" determination in *Roth,* under *N.J.S.A.* 2C:44–1(d). *Megargel, supra,* 278 *N.J.Super.* at 569, 651 *A.*2d 1051 (Keefe, J.A.D., dissenting). In *Roth,* defendant was convicted of aggravated sexual assault and sentenced to a probationary term. *Roth, supra,* 95 *N.J.* at 341, 471 *A.*2d 370. The Court reversed and remanded the trial court holding that there was a presumption of imprisonment for first and second-degree crimes. *Id.* at 358–59,

471 *A*.2d 370. The *Roth* decision addressed the application of *N.J.S.A.* 2C:44–1(d), which reads:

> The court shall deal with a person who has been convicted of a crime of the first or second degree by imposing a sentence of imprisonment unless, having regard to the character and condition of the defendant, it is of the opinion that his imprisonment would be a *serious injustice* which overrides the need to deter such conduct by others.
>
> [*N.J.S.A.* 2C:44–1(d) (emphasis added) ].

The *Roth* Court noted that *N.J.S.A.* 2C:44–1(d) created a presumption of imprisonment for anyone convicted of a first or second-degree crime. *Roth, supra,* 95 *N.J.* at 357, 471 *A*.2d 370. The Court further explained that *N.J.S.A.* 2C:44–1(d) operated to preserve a residuum of discretion for the sentencing court. *Id.* at 358, 471 *A*.2d 370. The Court observed, however, that this power "is to be exercised under the narrow exception to the statute, that is, when 'having regard to the character and condition of the defendant [the court] is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others.'" *Ibid.* (quoting *N.J.S.A.* 2C:44–1(d)). The Court explained that "[t]his standard is met only in 'truly extraordinary and unanticipated circumstances.'" *Ibid.* (citation omitted).

The "serious injustice" standard found in *N.J.S.A.* 2C:44–1(d) is not the same as the "in the interest of justice" standard found in section 44–1f(2). First, the language of the two statutes is different. In *N.J.S.A.* 2C:44–1(d) the "character and condition of the defendant" are specifically to be considered. In section 44–1f(2), there is no reference to the defendant's character or condition. Second, the two statutes address two qualitatively different situations. *N.J.S.A.* 2C:44–1(d) governs imprisonment versus nonimprisonment, a more serious condition, while section 2C:44–1f(2) governs whether or not a defendant convicted of a crime should be sentenced as if convicted of a crime one degree lower.

Finally, in *State v. Hodge,* we recognized that the standards governing the two statutes are different. *Hodge, supra,* 95 *N.J.* at 376, 471 *A*.2d 389. The *Hodge* Court noted that since the Code

requires a high standard even for downgrading, it must have contemplated an even higher standard to give confidence to the "in or out" decision. *Ibid.* This Court's decision in *Hodge* suggests not only that the standard governing the downgrading of a defendant's sentence is different from that governing the decision to sentence defendant to a custodial term, but that the standard governing downgrading is high. Therefore, "serious injustice" is not the equivalent of "in the interest of justice."

What then should a trial court consider in determining whether a defendant's first or second degree conviction should be downgraded pursuant to section 44–1f(2)? "We realize that there is no calculus that will guide the pen to the perfect sentence." *Hodge, supra,* 95 *N.J.* at 379, 471 *A.*2d 389. Nonetheless, in sentencing under section 44:1f(2), a court must apply the basic principles that are applicable to all sentencing decisions under the Code. It is therefore, paramount that the sentence reflect the Legislature's intention that the severity of the crime now be the most single important factor in the sentencing process. *Hodge, supra,* 95 *N.J.* at 379, 471 *A.*2d 389. The focus on the offense rather than the offender is inexorable in formulating a sentence. *Roth, supra,* 95 *N.J.* at 367, 471 *A.*2d 370. The paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protection and the more need for deterrence.

In evaluating the severity of the crime, the trial court must consider the nature of and the relevant circumstances pertaining to the offense. Every offense arises in different factual circumstances. The surrounding circumstances of an offense may make it very similar to a lower degree offense, thus suggesting that a downgraded sentence may be appropriate. For example, a defendant who simulates having a gun by placing his hand in his pocket can be convicted of first-degree robbery. *State v. LaFrance,* 117 *N.J.* 583, 595, 569 *A.*2d 1308 (1990). Such a crime, however, is

very similar to second-degree robbery. *State v. Hutson,* 107 *N.J.* 222, 230, 526 *A.*2d 687 (1987).

■ Although the degree of the crime is the focus of the sentence, facts personal to the defendant may be considered in the sentencing process. *State v. Jarbath,* 114 *N.J.* 394, 555 *A.*2d 559 (1989). Courts should consider a defendant's role in the incident to determine the need to deter him from further crimes and the corresponding need to protect the public from him. Was the defendant the mastermind, a loyal follower, an accomplice whose shared intent is problematic, or an individual who is mentally incapable of forming the necessary criminal intent? In *Jarbath* the Court found that imprisoning a severely mentally retarded woman would constitute a serious injustice.

Deterrence has been repeatedly identified in all facets of the criminal justice system as one of the most important factors in sentencing. Deterrence is the key to the proper understanding of protecting the public. *State in the Interest of C.A.H. & B.A.R.,* 89 *N.J.* 326, 334, 446 *A.*2d 93 (1982). The "concept of deterrence and the need to balance individual justice with the needs of society" is "a balancing process that is basic and fundamental to the general scheme of the criminal law." *Id.* at 336, 446 *A.*2d 93. "[D]emands for deterrence are strengthened in direct proportion to the gravity and harmlessness of the offense and the deliberateness of the offender." *Id.* at 337, 446 *A.*2d 93.

■ In addition to requiring a court to consider general sentencing principles, a court must consider whether there is a compelling reason to downgrade defendant's sentence in the interest of justice under section 44–1f(2). *Jones, supra,* 197 *N.J.Super.* at 607, 485 *A.*2d 1063. The differences between *N.J.S.A.* 2C:44–1(d) and section 44–1f(2), make it clear that because the "serious injustice" standard requires "truly extraordinary and unanticipated circumstances" to exist to overcome the presumption of imprisonment, a somewhat lower standard should apply to the decision to downgrade a defendant's sentence. *N.J.S.A.* 44–1(d) and section 44–1f(2). The decision to downgrade a defendant's

sentence "in the interest of justice" should be limited to those circumstances in which defendant can provide "compelling" reasons for the downgrade. *Jones, supra,* 197 *N.J.Super.* at 607, 485 *A.*2d 1063. These reasons must be in addition to, and separate from, the "mitigating factors which substantially outweigh the aggravating factors," that the trial court finds applicable to a defendant under the first prong of section 44–1f(2).

Furthermore, in those cases in which the Legislature has acted to provide an enhanced penalty for conviction of a particular offense, the downgrade of that offense requires more compelling reasons than the downgrade of an offense for which the Legislature has not attached an enhanced penalty. By its description of the sentence, the Legislature has indicated that an enhanced sentence was contemplated for this crime. *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980). *Mirakaj, supra,* 268 *N.J.Super.* at 50–51, 632 *A.*2d 850 ("The Legislature has established a thirty year maximum and a twenty year presumptive term for aggravated manslaughter ... which reflects a legislative judgement that this is an especially serious first degree offense"). Under such circumstances, trial courts must exercise extreme caution.

Finally, as in all sentencing decisions, the trial court must clearly identify the relevant sentencing factors and describe how it exercised its discretion balancing these factors. *State v. Kruse,* 105 *N.J.* 354, 521 *A.*2d 836 (1987). Such balancing must be set forth in the record. For example, in this case, the trial court should have set forth its reasons why the interest of justice demands a downgrade. A trial court should also state why sentencing the defendant to the lowest range of sentencing for the particular offense for which he was convicted, is not a more appropriate sentence than a downgraded sentence under section 44–1f(2).

## V

Applying those standards we find that the trial court's conclusion that the interest of justice demanded defendant's sen-

tence be downgraded to a crime one degree lower pursuant to *N.J.S.A.* 2C:44–1f(2) was in error. The trial court's only reference to the "interest of justice" requirement occurred at the end of the sentencing proceeding. The trial court stated "In the interests of justice, I sentence the defendant to a term of incarceration as if he were convicted of a second-degree offense." The court failed to identify any reasons, compelling or otherwise, in addition to and separate from, the mitigating factors, which would explain why the interest of justice demanded a downgraded sentence.

Moreover, the court's consideration of the nature of defendant's crime was cursory—a mere acknowledgment that defendant was convicted of first-degree kidnapping. There was no reference to the Legislature's intent in treating first-degree kidnapping as a particularly serious crime subject to an enhanced penalty.

First-degree kidnapping under the Code mandates an ordinary term of imprisonment of fifteen to thirty years with a presumptive term of twenty years. *N.J.S.A.* 2C:13–1(c). The penalty for conviction of first-degree kidnapping under the Code is far more severe than for that imposed on other first degree offenses. *N.J.S.A.* 2C:43–6. *N.J.S.A.* 2C:43–6a(1) states that "Except as otherwise provided, a person who has been convicted of a crime may be sentenced to imprisonment as follows: in the case of a crime of the first-degree, for a specific term of years which shall be fixed by the court and shall be between 10 and 20 years." *N.J.S.A.* 2C:43–6a(1). In fact, "[k]idnapping, which was only a misdemeanor at common law, has become in modern legislation one of the most severely punished offenses." *The New Jersey Penal Code, Vol. II: Commentary, Final Report to the Criminal Law Revision Commission*, 181 (1971).

New Jersey case law reflects the legislative judgement that kidnapping is a serious offense. *State v. Brent*, 137 *N.J.* 107, 120, 644 *A.*2d 583 (1994). "It is evident that the legislature intended harsh treatment for kidnappers; it is further evident that by maximizing the kidnapper's incentive to return the victim un-harmed, the legislature realized that the risk of harm attendant

upon isolation is the principal danger of the crime." *Brent, supra,* 137 *N.J.* at 120, 644 *A.*2d 583 (quoting *State v. Masino,* 94 *N.J.* 436, 446, 466 *A.*2d 955 (1983)).

We agree that defendant had a more limited role in the incident than did Lee. Defendant claimed he was unaware of what was going to occur that night and would have left had he not feared for his own safety. Defendant was 18 years old at the time of the incident and may have been impressed with, and unduly influenced by, the co-defendant, Lee, who was more mature and whom defendant believed held a position of authority. Defendant certainly was not the mastermind behind the assault on Harris. However, defendant was at the very least an accomplice to a crime in which the victim was terrorized and beaten over a period of time. The jury in convicting Megargel of first-degree kidnapping "rejected Megargel's attempt to convince them that he had no idea that Lee and his friends were about to embark on any criminal behavior, and that he subsequently acted out of fright and under orders." 278 *N.J.Super.* at 571, 651 *A.*2d 1051 (Keefe, dissenting).

We do not find defendant an exceptional defendant "or one caught up in a maelstrom of 'engulfing circumstances.' " *Roth, supra,* 95 *N.J.* at 368, 471 *A.*2d 370 (quoting *State v. Leggeadrini,* 75 *N.J.* 150, 160, 380 *A.*2d 1112 (1977)). Focusing on the serious nature of the crime (first-degree kidnapping, which carries a presumptive term of twenty years), and recalling that this Court has demanded that trial courts exercise caution when downgrading a sentence for an offense that carries an enhanced penalty, we conclude that nothing in the record suggests that a downgrade of defendant's sentence to second-degree offense was appropriate. Moreover, despite defendant's limited role in the attack on Harris, to downgrade defendant's sentence to a crime one degree lower would frustrate the legislative intent to punish severely those convicted of first-degree kidnapping.

## VI

We conclude that the standard for downgrading an offense for the purpose of sentencing under section 44–1f(2) is two-

pronged: first, the court must be "clearly convinced" that the mitigating factors "substantially" outweigh the aggravating ones, and second, the court must find that the "interest of justice" demands that the sentence be downgraded. The reasons justifying a downgrade must be "compelling," and something in addition to and separate from, the mitigating factors that substantially outweigh the aggravating factors.

The Legislature's creation of a lengthier sentence and presumptive term of imprisonment for a conviction of first-degree kidnapping mandates that a trial court should exercise special caution before downgrading such a serious offense. The trial court must adhere to the principles applicable to all sentencing matters. Thus, the trial court must focus primarily on the gravity of the crime.

## VII

N.J.S.A. 2C:13–1c(1) gives the sentencing court discretion to sentence defendant between fifteen and thirty years for first-degree kidnapping. Under N.J.S.A. 2C:44–1f, if the mitigating factors preponderate over the aggravating factors, a term lesser than the presumptive can be imposed within the range established. See State v. Balfour, 135 N.J. 30, 35, 637 A.2d 1249 (1994). The trial court correctly found that the mitigating factors substantially outweigh the aggravating factors. In addition, an impressive array of family and friends all characterized defendant as "naive and impressionable." Finally, defendant had a limited role in the incident and may have felt forced to participate because all of the assailants had weapons. Accordingly, although the facts of this case do not warrant a downgrade of defendant's sentence from a first-degree offense to a second-degree offense, we find that defendant is entitled to be sentenced to the minimum term for a person convicted of first-degree kidnapping, namely, fifteen years. Since he is subject to the Graves Act, his parole ineligibility would be five years.

The judgment of the Appellate Division is reversed. Defendant's sentence is vacated. However, because the trial judge is no longer on the bench, rather than remand the matter to the trial court for resentencing in accordance with this opinion, we have carefully reviewed the record and hereby sentence defendant to a term of fifteen years with a five year parole disqualifier.

STEIN, J., dissenting.

In *State v. Roth*, 95 *N.J.* 334, 471 *A.*2d 370 (1984), this Court established a durable and principled standard for appellate review of criminal sentences. Its basic premise was that "[w]e must avoid the substitution of appellate judgment for trial court judgment," *id.* at 365, 471 *A.*2d 370, and we explained that the power to modify sentences reserved to appellate courts was to be exercised only "when the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience." *Id.* at 364, 471 *A.*2d 370. The Court clearly and emphatically stated its commitment to respect the sentencing determinations of trial judges who follow the law:

> Pronouncement of judgment of sentence is among the most solemn and serious responsibilities of a trial court. No word formula will ever eliminate this requirement that justice be done. There is no room for trial or appellate courts to consider the public perceptions of sentences: "Judicial recognition of or action upon public opinion against a particular defendant cannot be tolerated in our criminal justice system." *State v. Humphreys*, 89 *N.J.* 4, 15, 444 *A.*2d 569 (1982). We are confident that our judges are people of "fortitude, able to thrive in a hardy climate." *Craig v. Harney*, 331 *U.S.* 367, 376, 67 *S.Ct.* 1249, 1255, 91 *L.Ed.* 1546, 1552 (1947). Our new Code reflects a delicate balance between discretion and fixed sentencing. An independent judiciary is its fulcrum. When conscientious trial judges exercise discretion in accordance with the principles set forth in the Code and defined by us today, they need fear no second-guessing.
>
> [*Id.* at 365, 471 *A.*2d 370.]

Based on the Court's disposition of this appeal, trial judges assigned to the Criminal Part may question the strength of the Court's commitment to defer to their sentencing determinations. Here, the trial judge that presided over defendant's six-day jury trial carefully and methodically explained, tracking the applicable provisions of the New Jersey Code of Criminal Justice (Code), the

basis for his decision to sentence defendant in accordance with *N.J.S.A.* 2C:44–1f(2) to a term appropriate for an offense one degree lower than the offense of which defendant was convicted, first-degree kidnapping. Concluding that the mitigating factors substantially outweighed the sole aggravating factor and that defendant's involvement in the criminal enterprise was limited, the trial court sentenced defendant to seven-years imprisonment, three years without parole eligibility. A divided panel of the Appellate Division affirmed, the majority observing that "[a]s a reviewing court, we must respect such a reasoned exercise of judgment by a conscientious sentencing judge." 278 *N.J.Super.* 557, 566, 651 *A.*2d 1051 (1995).

Although agreeing with the trial court's conclusion that "the mitigating factors substantially outweigh the aggravating factors" and noting that "defendant had a limited role in the incident and may have felt forced to participate because all of the assailants had weapons," *ante* at 505, 673 *A.*2d at 269, the Court nevertheless substitutes its judgment for that of the trial court and imposes a sentence of fifteen-years imprisonment with five years parole ineligibility. *Id.* at 506.

## I

The Court unpersuasively attempts to justify the substitution of its own sentence for that of the trial court on the basis of a purported legal error: the Court holds that a downgraded sentence under *N.J.S.A.* 2C:44–1f(2) requires a finding not only that the mitigating factors outweigh the aggravating, but that in addition the "interests of justice"—defined for the very first time by the Court as "compelling reasons" separate from the balance of aggravating and mitigating factors, *ante* at 501, 502, 673 *A.*2d at 267, 268—require a downgrade. The Court concludes that the trial court erred in failing to articulate any "compelling reasons" other than the balance of mitigating and aggravating factors to support its sentence. That alleged "error," on closer examination, cannot bear the weight imposed on it by the Court's opinion. The

obvious "compelling reason" relied on by the trial court to support the downgrade was the jury's acquittal of defendant on charges of first-degree robbery, conspiracy to commit first-degree robbery, possession of a firearm for an unlawful purpose, possession of a handgun without a permit, three charges of aggravated assault, and possession of a shotgun, the jury verdict demonstrating persuasively that the jury believed Megargel's version of the incident and rejected the victim's more incriminating version. The Appellate Division panel had no difficulty in concluding that the trial court's reliance on the jury verdict was a compelling independent factor in its sentencing determination:

> We are mindful that the Prosecutor has a different version of Megargel's involvement based primarily on the testimony of Harris that Megargel was one of the persons who beat and terrorized him. However, Megargel testified that his only participation was to drive the car, and that he drove as the others ordered him to. The jury acquittal of Megargel on the assault, robbery and firearm charges indicates that the jury did not accept Harris' testimony. The judge's sentencing reasons indicate that he viewed the evidence as the jury did.
>
> The judge's sentencing reasons reflect a conscientious and comprehensive analysis of the facts, the aggravating and mitigating factors and the applicable legal principles. The judge was in a good position to make an accurate analysis since he was the trial judge. He heard the testimony of the witnesses, including the testimony of Harris, Lee and Megargel. His findings as to the facts and the meaning of the jury's verdict must therefore be given great weight.
>
> \*      \*.      \*      \*      \*      \*      \*      \*
>
> We also do not minimize this dreadful crime. However, notwithstanding the seriousness of the crime, we cannot find in the face of the judge's logical and comprehensive reasons that no reasonable sentencing judge could have imposed this sentence. [*State v.*] *Ghertler,* [ ] 114 N.J. [383,] 388, 555 A.2d 553 [ (1989) ].
>
> The trial judge's finding as to the interest of justice was not plucked out of thin air. The judge analyzed the meaning of the jury verdict corroborated by his view as the trial judge. He concluded that Megargel had a limited involvement in the criminal enterprise. The judge found many strong and significant mitigating factors as articulately described in his sentencing reasons. The foregoing offers strong support for the judge's exercise of sentencing judgment and discretion in reaching his conclusion as to the interest of justice. As a reviewing court, we must respect such a reasoned exercise of judgment by a conscientious sentencing judge.
>
> [278 *N.J.Super.* at 565–66, 651 A.2d 1051.]

Concededly, the trial court did not state in so many words that the jury's acquittal of Megargel of *all* charges other than kidnapping confirmed its view that Megargel had been influenced and

dominated by Lee and the other perpetrators, and that Megargel's completely passive role in the incident, his non-involvement in the assaultive conduct or the robbery, his youth and inexperience, and the outpouring of letters attesting to his good character, justified imposition of a sentence appropriate to a crime one degree lower than kidnapping. Surely, reliance on the jury verdict convicting Lee of robbery, conspiracy, aggravated assault, and weapons-possession offenses, while acquitting Megargel of those same charges, was implicit in the trial court's determination that the interests of justice required a downgrade. Had the trial court made that reliance explicit, the Court would have been compelled to state candidly that it was resentencing defendant because the Court disagrees with the trial court's sentence and prefers to impose its own.

The Court offers one additional justification for its rejection of the trial court's sentence, noting that the authorized punishment for first-degree kidnapping ranges from fifteen to thirty years with a twenty-year presumptive term, *N.J.S.A.* 2C:13–1c, 2C:44–1f(1)(a), compared with the fifteen-year presumptive term and ten to twenty-year range authorized for most other first-degree crimes. Accordingly, the Court observes that even "more compelling reasons" are required for the downgrade of an offense carrying an enhanced sentence than would be required for other first-degree offenses. *Ante* at 502, 673 *A.*2d at 267. The Legislature, however, has not excluded kidnapping or aggravated manslaughter from the scope of the sentencing downgrade provisions; to the contrary, the preceding paragraph of the very same subsection of the Code, 2C:44–1f(1), sets forth the presumptive terms for kidnapping and aggravated manslaughter, making unmistakable the Legislature's intention to make those offenses subject to the sentencing downgrade authorization set forth in *N.J.S.A.* 2C:44–1f(2).

That the Court may not find the trial court's reasons "compelling enough" to support its downgraded sentence does not constitute legal error, nor a failure to adhere to the Code's sentencing

principles. It reflects merely a difference of opinion between the reviewing Court and the court that heard the evidence, the very kind of difference of opinion that we anticipated in *Roth* when we pledged not to second-guess trial judges who adhere to the Code's sentencing principles. 95 *N.J.* at 365, 471 *A.*2d 370.

An additional observation is warranted about the real-time difference between the Court's sentence of fifteen years with five years parole ineligibility and the trial court's sentence of seven years and three years parole ineligibility. Parole statistics confirm that the majority of sentenced offenders are granted parole at the first hearing for which they are eligible, suggesting that two years is the real-time difference between this Court's sentence and that imposed by the trial court. The Appellate Division's observation about that sentencing difference is persuasive:

> The issue here is not jail or freedom. If the sentencing judge had not sentenced Megargel as a second degree offender, the judge would probably have imposed the minimum sentence for the first degree crime. This would have been fifteen years with a five year parole ineligibility term. The defendant as a first offender would very likely have been paroled upon service of the five year ineligibility term.
>
> Thus the central issue is whether we should reverse a sentencing judge's carefully reasoned determination that this defendant, an impressionable, trusting, and naive eighteen year old first offender, whose involvement in the crime was much less than the others, should serve three rather than five years in state prison. Our judicial conscience is not shocked by three years rather than five. A reversal would be second guessing the sentencing judge's determination by substituting our judgment for his.
>
> [278 *N.J.Super.* at 567, 651 *A.*2d 1051.]

## II

In *State v. Roth, supra,* 95 *N.J.* 334, 471 *A.*2d 370, Justice O'Hern explained that the Code's sentencing format was based on a model of presumptive sentencing, pursuant to which

> the legislature would break crimes down into sub-categories, establish degrees of severity, determine how much the presumptive first offender sentence would be increased for succeeding convictions, define specific aggravating or mitigating factors, and provide that "[o]nly in truly extraordinary and unanticipated circumstances would the judge be permitted to deviate from the presumptive sentence *beyond* the narrow range permitted by an ordinary finding of aggravating or mitigating factors."
>
> [*Id.* at 354–55, 471 *A.*2d 370 (quoting *Fair and Certain Punishment, Report of the Twentieth Century Fund Task Force on Criminal Sentencing* (1976)).]

The Code's sentencing structure is designed to achieve uniformity in sentence and to narrow the scope of judicial discretion by requiring sentencing judges to sentence within prescribed statutory ranges, and to statutory presumptive terms unless shorter or longer sentences are required because of aggravating and mitigating factors. As we observed in *State v. Hodge*, 95 *N.J.* 369, 379, 471 *A.2d* 389 (1984): "The Code is a restraint upon the discretion of judges in individual cases. But there can be no justice without a predictable degree of uniformity in sentencing.... The loss of unfettered discretion may be the price of evenhanded justice." Thus, our commitment not to second-guess the exercise of discretion by sentencing judges in accordance with the Code, *Roth, supra*, 95 *N.J.* at 365, 471 *A.2d* 370, is qualified by the pragmatic recognition that the Code severely limits the circumstances in which sentencing judges have significant discretion to exercise.

*N.J.S.A.* 2C:44-1 includes provisions that permit sentencing judges to depart from the Code's precise sentencing guidelines under certain prescribed conditions. Pursuant to *N.J.S.A.* 2C:44-1(d), a court is mandated to sentence offenders convicted of first- or second-degree crimes to a term of imprisonment "unless, having regard to the character and condition of the defendant, it is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others." However, we have characterized the standard for permitting non-custodial sentences for first- and second-degree offenders as "extremely narrow," to be "applied only under circumstances that are 'truly extraordinary and unanticipated.'" *State v. Jarbath*, 114 *N.J.* 394, 406, 555 *A.2d* 559 (1989) (quoting *Roth, supra*, 95 *N.J.* at 358, 471 *A.2d* 370). The Court's opinion acknowledges that the standard for allowing sentencing courts to impose a non-custodial sentence on first- or second-degree offenders is considerably more stringent than that governing downgrading of sentences under 2C:44-1f(2). *Ante* at 499–500, 673 *A.2d* at 266.

*N.J.S.A.* 2C:44–1e establishes a presumption of non-incarceration for first offenders convicted of crimes other than first- or second-degree offenses, but authorizes the court to impose a term of imprisonment if "having regard to the nature and circumstances of the offense and the history, character and condition of the defendant, it is of the opinion that ... imprisonment is necessary for the protection of the public." We noted in *State v. Gardner*, 113 *N.J.* 510, 551 *A.*2d 981 (1989), the high standard that must be met before that provision of the Code properly may be invoked:

> Therefore, before the presumption against imprisonment of a first offender who pleads guilty to a crime of the third degree may be overcome, the sentencing court must be persuaded by a standard that is higher than "clear and convincing" evidence that incarceration is necessary. And once the presumption has been overcome, the defendant *must* be sentenced according to the statutory guidelines.

> [*Id.* at 517–18, 551 *A.*2d 981.]

By comparison, the downgrade authorized by *N.J.S.A.* 2C:44–1f(2), because it does not implicate the "in or out" decision—whether the defendant is to be incarcerated—should be governed by a less rigid standard, as the Court's opinion acknowledges. *Ante* at 499–500, 673 *A.*2d at 266. The statute provides:

> In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.

> [*N.J.S.A.* 2C:44–1f(2).]

Although the legislative history is sparse, the obvious legislative objective was to authorize sentencing judges already required by the Code to sentence a first- or second-degree offender to imprisonment, to impose a prison term appropriate to an offense one degree lower if the statutory conditions are satisfied. The specific condition is that the sentencing judge be "clearly convinced that the mitigating factors substantially outweigh the aggravating factors," a condition that the Court agrees was correctly found by the trial court to have been met. The general condition is that the "interests of justice" demands the downgrade.

As the Court notes, however, the term "interests of justice" is defined neither in the definitional section of the Code, *N.J.S.A.* 2C:1–14, nor in five other sections of the Code in which that phrase or a variant is used. *Ante* at 496, 673 *A.*2d at 264–265. The conclusion is inescapable that the Legislature's reliance on the "interests of justice" standard in *N.J.S.A.* 2C:44–1f(2) marks one of the rare circumstances in the Code in which a significant residuum of sentencing discretion is reserved to trial judges, a discretionary power exceeded only by a sentencing court's discretion to sentence defendants consecutively or concurrently. *Cf. State v. Ghertler,* 114 *N.J.* 383, 393–94, 555 *A.*2d 553 (1989) (reversing Appellate Division's imposition of concurrent rather than consecutive sentences prescribed by trial court and observing that mere disagreement over sentencing results does not justify substitution of appellate court's sentencing preference over that chosen by sentencing court).

That we have not heretofore reviewed a sentence imposed pursuant to the downgrade authorization, despite the State's right to appeal, see *N.J.S.A.* 2C:44–1f(2), suggests that the discretion conferred on sentencing judges by the downgrade provision has not been abused. To the contrary, statistics compiled by the Administrative Office of the Courts reveal that during 1992 and 1993, a total of 1198 first- and second-degree offenders were sentenced pursuant to 2C:44–1f(2) as if the offense they committed was one degree less serious, but of that number 1178 downgrades, or 98.3%, were imposed pursuant to and presumably authorized by plea agreements. Only twenty sentencing downgrades statewide during those same two years were imposed pursuant to a trial court's exercise of sentencing discretion. See *Memorandum from Criminal Practice Division, Administrative Office of the Courts* (Feb. 15, 1996) (on file with Clerk of the Supreme Court of New Jersey). That statistically insignificant use of the Code's downgrade authorization, combined with the scarcity of reported decisions concerning sentencing courts' applications of *N.J.S.A.* 2C:44–1f(2), confirms that the limited grant of discretionary authority to downgrade sentences in the "interests of justice" has been spar-

ingly exercised by the Criminal Part bench. No apparent justification exists for the Court to cast a shadow of disapproval over a discretionary sentencing power so rarely invoked by trial courts.

I have no disagreement with the Court's conclusion that the reference to "interests of justice" contemplates a determination by the sentencing court that goes beyond the balancing of aggravating and mitigating factors. But all that the Court has managed to add to the balance of aggravating and mitigating factors is a requirement that the defendant establish "compelling reasons" for the downgrade, *ante* at 502, 673 *A.*2d at 267, a "standard" that it extracts from a single Appellate Division decision, *State v. Jones,* 197 *N.J.Super.* 604, 607, 485 *A.*2d 1063 (1984), and that even "more compelling reasons" are required to downgrade a sentence for an offense for which the Legislature has prescribed an enhanced penalty. *Ante* at 502, 673 *A.*2d at 267. The substantive content of the reasons compelling enough to justify a downgrade is conspicuously absent from the Court's analysis.

The Court suggests, however, that focus on the offense rather than the offender is critical in formulating a proper sentence, and that the defendant's role in the offense may be considered in assessing the need for deterrence. *Ante* at 500, 673 *A.*2d at 266. That concession implies that the jury's determination through its verdict that defendant was an incidental participant in the kidnapping, uninvolved in the robbery, assaultive conduct, or weapons possession that facilitated and characterized the kidnapping offense, could constitute a "compelling reason" to justify the downgraded sentence, especially where the trial court concurs in the jury's assessment that defendant's role was passive and incidental. The Court's opinion neither accepts nor rejects the contention that defendant's limited participation in the offense, verified by the jury verdict, meets the standard of "compelling reasons," simply observing that the trial court failed to "set forth its reasons [on the record] why the interest of justice demands a downgrade," *ante* at 502, 673 *A.*2d at 268, and concluding categorically that the downgraded sentence was error.

I find the Court's analysis and conclusion unpersuasive. I am convinced that a fair reading of this record, combined with the trial court's careful and conscientious application of Code principles to explain the downgraded sentence, justify an affirmance of the sentence even under the "compelling reasons" test newly adopted by the Court to add content to the statutory interest-of-justice standard. Affirmance of the sentence does not mean that the Court would have imposed the same sentence itself, but rather would have signified the Court's adherence to the basic precept that "[w]e must avoid the substitution of appellate judgment for trial court judgment." *Roth, supra,* 95 *N.J.* at 365, 471 *A.*2d 370. The Court's substitution of its own sentence that effectively imposes only two years more "real time" than the trial court's sentence reflects a disagreement rooted not in the Code's sentencing principles, but rather in a different perception about the precise term of incarceration that defendant should serve. Given the trial court's obvious effort to adhere scrupulously to Code principles, the Court's intercession may be viewed as a warning that downgraded sentences, however rare, are subject to searching appellate review and may readily be set aside if the appellate court concludes that a longer sentence is more appropriate.

I would affirm the judgment of the Appellate Division upholding the sentence imposed by the trial court.

*For reversal and vacation*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—6.

*For affirmance*—Justice STEIN—1.