**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0432-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANTHONY FIELD, a/k/a
ANTHONY LEE HOWARD
FIELD, and ANTHONY
HOWARD FIELDS,

     Defendant-Appellant.

_____

Submitted November 18, 2019 – Decided  August 13, 2020

Before Judges Messano, Vernoia, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-09-2290.

Joseph E. Krakora, Public Defender, attorney for appellant (Marcia H. Blum, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Anthony Field appeals from his conviction and aggregate ninety-nine-year sentence for a 2013 Christmas morning shooting that left three victims dead and two others injured. Based on our review of the record, we reject defendant's claims the court erred in its jury instruction on flight, by admitting testimony from a police detective, and in imposing sentence, and we affirm.

I.

Just past midnight on the morning of December 25, 2013, Woodley Daniel stood in the vestibule entryway of Slick's GoGo Bar (Slick's) in Irvington. Daniel worked security at the bar's front door and collected cover charges from its patrons. He became involved in a physical altercation with a prospective customer, later identified as Muhammad Bogar, that spilled out onto the street. Multiple gunshots were fired by a single perpetrator, leaving Daniel and two others dead and injuring two of the bar's patrons. During the ensuing police investigation, multiple witnesses identified defendant as the shooter.

A grand jury indicted defendant for three counts of first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) (counts one, two and three); two counts of first-degree kidnapping, N.J.S.A. 2C:13-1(a) (counts five and six); two

counts of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (counts seven and eight); first-degree carjacking, N.J.S.A. 2C:15-2(a)(1) (count four); fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4) (count nine); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count ten); and second-degree unlawful possession of a handgun for an unlawful purpose, N.J.S.A. 2C 39-4(a) (count eleven).[1]

The trial evidence showed Pierre Clervoyant, Sr. (Clervoyant, Sr.) was one of Slick's owners. On December 24, 2013, Clervoyant, Sr., his son, Pierre Clervoyant, Jr. (Pierre), and Camille Hedge tended bar while Daniel worked at the bar's front door.[2] The door opened to a vestibule, which had a second door that opened into the bar. Once in the vestibule, patrons walked through a metal detector and were patted down by Daniel. There were surveillance cameras inside and outside the bar, which worked and recorded on December 24 and 25, 2013.

---

[1] Prior to trial, the court granted the State's motion to amend count four to charge a violation of N.J.S.A. 2C:15-2(a)(2), and counts five and six to charge violations of N.J.S.A. 2C:13-1(b)(1).

[2] Because Pierre Clervoyant, Sr. and Pierre Clervoyant, Jr. share a surname, we refer to Pierre Clervoyant, Jr. as Pierre for clarity and to avoid confusion. We intend no disrespect by this informality.

A-0432-17T4

Late in the evening on December 24, 2013, defendant entered the bar with Imani Sapini and a man Sapini knew as NuNu. Sapini was a friend of defendant, who Sapini knew by the name Bullet.[3] Sapini was scheduled to perform as a singer at the bar. After spending some time in the bar, she exited through the front door to smoke, heard gunshots, and ran. At trial, Sapini testified she did not see defendant with a gun that evening and did not see the shooter. When asked whether she tried to "take a look at the shooter, to see who might be . . . pulling the trigger," she responded "No, . . . I didn't. I just ran." She testified that, on the night of the incident, defendant wore a hat and a jacket with a gray stripe on the shoulder.

Following a Gross[4] hearing, portions of a December 31, 2013 statement Sapini gave to the police were played for the jury. In the statement, Sapini said that after the shooting, she saw defendant run toward Bogar's car with a small

---

[3] The parties stipulated defendant's high school football coach gave him this nickname because of his quickness, and the judge read the stipulation to the jury, informing them they "should not draw any conclusion or inferences from this nickname."

[4] A Gross hearing is a N.J.R.E. "104 hearing . . . the trial court conducts to determine the admissibility of a witness's inconsistent out-of-court statement -- offered by the party calling that witness -- by assessing whether the statement is reliable. See State v. Gross, 121 N.J. 1, 10 (1990)." State v. Greene, ___ N.J. ___, ___ n.2 (2020) (slip op. at 10).

black gun, possibly a nine-millimeter handgun, in his hand. According to her statement, after the shooting she and Bogar entered Bogar's car first, and Bogar told defendant he could not get in the car "[b]ecause of what just happened." Sapini explained that defendant nevertheless entered the back seat of the car, "and that's when he put [the gun] to [Bogar's] head, and told [Bogar] that he had to take [defendant] and drop him off."

Bogar knew defendant and Sapini prior to the incident. He testified that he and two friends, Mu Trills[5] and Mushir Cureton, went to the bar to see Sapini perform. Bogar drove Trills and Cureton to the bar and parked his car around the corner. A surveillance video recording shows Bogar and his friends arriving at the bar at 12:26 a.m.

Bogar testified Sapini told him he would not have to pay the cover charge to enter the bar because Sapini was performing. According to Bogar, when he and his two friends arrived at the bar, Trills entered first, went through the metal detector, was patted down, and was admitted without paying the cover charge.

---

[5] The police were unable to locate the individual identified as Mu Trills during their investigation. No one identifying themselves as Mu Trills testified at trial.

A-0432-17T4

Daniel then patted Bogar down and told him he had to pay the cover charge.[6] Bogar argued with Daniel about the payment, and Bogar testified Daniel then "start[ed] pushing [him], tussling, [and they] started tussling inside the hallway."

Bogar explained that during the altercation, Daniel grabbed Bogar by his hair, and he and Bogar hit each other. Bogar was pushed out the front door onto the street, where he pulled away from Daniel and heard shots fired. Bogar saw defendant shooting a black gun, and Bogar ran to his car.

Bogar explained that after arriving at his car, he started the engine and Sapini appeared, entered the car, and sat in the front passenger seat. Defendant appeared next, opened the rear door, and got in the car, but Bogar told defendant he would not take him anywhere because defendant "just shot them people." Defendant pointed a gun at Bogar, started cursing at him and told him to "drive." Bogar drove away, dropped defendant off at another location, and then dropped off Sapini. Bogar testified he did not have any weapons with him that evening.

---

[6] Bogar referred to the individual who required he pay the cover charge and with whom he had the physical altercation as the "bouncer." It is undisputed the individual was Daniel.

A-0432-17T4

Three days later, Bogar gave a statement to the Essex County Prosecutor's Office. Bogar was shown two photo arrays, and he identified defendant's photograph in the second array as the individual who was the shooter.

At trial, Bogar acknowledged that, at the time of the shooting, he was a member of a street gang, but he denied knowing whether Sapini was also a member. He also denied speaking with Sapini during the three years following the shooting and prior to trial. He denied having had any contact with Trills following the incident, but he admitted he told the police Trills said he did not want to be involved with the investigation.

Ravin Neal, a dancer at Slick's, also testified at trial, explaining she was about to go outside to smoke when she saw Daniel frisk a man at the front door and argue with him because the man did not want to leave his weapon outside. Neal saw Daniel "tussling" with the man and his friend, who Neal identified as one of the decedents. Neal also saw Pierre jump over the bar and join in the scuffle, which moved out of the vestibule and onto the street. As Neal stood in the doorway, she saw a young man in the middle of the street come toward towards the bar door, "and [he] started shooting."

Neal testified the shooter was alone, had a gun in his hand, and was in the middle of the street walking toward the bar while shooting. According to Neal,

A-0432-17T4

prior to the shooting, the man was in a car parked near the bar. Neal testified that after he got out of the car, the man went to the middle of the street and shot Daniel, Pierre, and a third man. Neal further testified she stood there for a "good minute," looked at the shooter's face, and was certain the shooter was not the person with whom Daniel tussled at the door.

On December 25, 2015, Neal gave a statement to the police, explaining the shooter wore a hat and she would be able to identify him again. Two weeks later, Neal selected defendant's photograph from an array "as being the shooter who was outside [the bar]." Neal did not want to sign her name on the photograph when she made the identification, but the photo array identification procedure was played for the jury. Neal identified defendant as the shooter at trial.

Guenson Adolphe, Pierre's friend and a regular patron of the bar, arrived at about 8:00 p.m. He left the bar, and, when he later returned, he saw Daniel fighting with a man near the bar's front door. Adolphe believed the argument started because the man did not want to be patted down. Adolphe testified the man fighting with Daniel was slim and had dreadlocks.

Adolphe saw Daniel grab the man and attempt to escort him out the door, and the two men tussled inside the vestibule and swung at each other. Adolphe

saw Pierre jump over the bar to try to break up the fight, and Adolphe also attempted to break up the fight. The fight spilled onto the street, and Adolphe "followed everyone outside the bar as well."

Adolphe testified that once outside, "he saw an individual, [and] the barrel of the gun pointing at [him]." He heard the shooter say "I'm going to kill all y'all." Adolphe put his hands up and was shot in the forearm. He landed on the ground facing the bar with his back to the street, and he "played dead." He heard several more gunshots and was shot in his left foot. After the shooting ended and "people started coming out" of the bar, Adolphe stood up and a friend drove him to the hospital. The police first interviewed Adolphe on December 26, 2013, after his admission to the hospital. He told the police that he believed a friend of the man who fought with Daniel was the shooter, and that the shooter also had dreadlocks. On January 15, 2014, Adolphe was questioned a second time, and he said the shooter was 5'6" or 5'7" tall, with light brown skin, a "Sunni-style" beard, and dark clothing. Adolphe was shown two photo arrays, and he selected defendant's photograph and identified defendant as the shooter. Adolphe also identified defendant as the shooter at trial.

Richard Duvivier was also at the bar when the shooting occurred. He testified that at around 12:30 a.m., he saw an altercation between Daniel and a

man at the front door, and he saw Pierre jump over the bar and head toward the door. Duvivier followed Pierre to the door, where he saw Daniel on top of a man, trying to restrain him. Duvivier heard multiple gunshots and saw the shooter fire at Daniel. Duvivier was shot in the ankle and the arm.

On the day following the incident, Duvivier gave a statement to the police in which he described the shooter as being 5'6" or 5'7" tall, light-brown skin, with a "Sunni-style" beard, short hair, dark clothing, a burgundy shirt, and possibly a skully or hat. Duvivier said the gunman shot Daniel first and he assumed the shooter had arrived at the bar with the man who was involved in the altercation with Daniel. Two days after his initial statement, Duvivier identified defendant in a photo array as the shooter.

Khaalia Mumford lived with defendant in December 2013 and is the mother of his children. She testified that on the night of the incident, defendant wore a black sweater with a gray stripe down the sleeve and black khaki pants with big pockets. At trial, Mumford identified defendant on the bar's surveillance recordings at different times during the incident and identified defendant in still photographs from the surveillance recordings.

Mumford also testified defendant arrived at their home in the early morning on December 25, 2013 and told her, "[he] may be in trouble." He then

left and returned around noon with gifts for their children.  Defendant left shortly after the children opened their gifts, and Mumford had not heard from him since that day.  She later learned defendant went to Florida, but she was unaware he had plans to travel there.

After the shooting, Daniel and Cureton were found unresponsive and were pronounced dead at the scene.  Cureton suffered six gunshot wounds, including wounds to the face, chest, back, right arm, and right hand.  Daniel suffered three gunshot wounds—to his head, right forearm, and right hip.  Daniel and Cureton shared the same cause of death: multiple gunshot wounds.

Pierre was in and out of consciousness when the police arrived and was later pronounced dead at the hospital.  It was determined his cause of death was three gunshot wounds to his lower back and buttocks.

Duvivier suffered two gunshot wounds, was in the hospital for three days, and continued to see a doctor as an outpatient for one-and-a-half years.  As a result of his injuries, Duvivier has difficulty walking, and, at the time of trial, he could not rotate his arm.

Adolphe was in the hospital for three days as a result of the gunshot wounds to his right arm, right hand, and left foot.  He had surgery on his foot about three to four months after the incident and used crutches for six months

11

thereafter.  As a result of his injuries, Adolphe has no feeling in his right hand and pain in his left foot during cold weather, and he was forced him to drop out of the state corrections academy.

Ten shell casings and a partial bullet fragment from a .45 caliber semiautomatic pistol were recovered from outside the bar. No gun was ever recovered.  On January 28, 2014, law enforcement arrested defendant in Florida and returned him to New Jersey.

The jury convicted defendant of the murder of Daniel as charged in count two and the lesser-included offenses of aggravated manslaughter of Pierre and Cureton under counts one and three respectively.  The jury also convicted defendant of the lesser-included offenses of third-degree aggravated assault by causing bodily injury with a deadly weapon to Duvivier (count seven) and Adolphe (count eight); of second-degree unlawful possession of a handgun (count ten); and of second-degree possession of a weapon for an unlawful purpose (count eleven).  The jury found defendant not guilty of kidnapping Bogar (count five) and Sapini (count six) and of carjacking Bogar (count four).

The court sentenced defendant to forty-five years on the murder conviction subject to the requirements of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.  The court sentenced defendant to twenty-seven years for

the aggravated manslaughter of Pierre and eighteen years for the aggravated manslaughter of Cureton, with each sentence subject to NERA's requirements. The court sentenced defendant to four-and-one-half years on each of the aggravated assault convictions. The court merged the weapons offenses with defendant's murder conviction. The court ordered that the sentences be served consecutively, resulting in an aggregate sentence of ninety-nine years with a seventy-six-and-one-half-year period of parole ineligibility pursuant to NERA.[7] This appeal followed.

Defendant offers the following arguments for our consideration:

POINT I

THE INSTRUCTION ON FLIGHT AS CONSCIOUSNESS OF GUILT WAS UNCONSTITUTIONAL BECAUSE IT SHIFTED THE BURDEN OF PROOF FROM THE STATE TO THE DEFENDANT.

POINT II

IT WAS REVERSIBLE ERROR FOR THE DETECTIVE TO GIVE HIS OPINION ON THE ULTIMATE ISSUE IN THE CASE AND TESTIFY THAT, HAVING VIEWED THE SAME VIDEO AS THE JURY, HE HAD IDENTIFIED THE PERSON "WHO MURDERED THE PEOPLE AT SLICK'S."

---

[7] The court later entered an amended judgment of conviction reflecting a fifteen-year period of parole supervision following defendant's release from incarceration.

A-0432-17T4

<u>POINT III</u>

THE IMPOSITION OF FIVE CONSECUTIVE TERMS, AMOUNTING TO A SENTENCE OF 99 YEARS, WITH A PAROLE DISQUALIFIER OF 76 1/2 YEARS, IS A DE FACTO TERM OF LIFE WITHOUT PAROLE. IT WAS IMPOSED WITHOUT SERIOUS CONSIDERATION OF DEFENDANT'S YOUTH AND ON QUESTIONABLE FACTUAL FINDINGS, IS GROSSLY EXCESSIVE FOR THIS TEENAGER, AND AMOUNTS TO CRUEL AND UNUSUAL PUNISHMENT.

II.

A.

Defendant objected to the State's request for a jury instruction on flight as consciousness of guilt. The court overruled the objection and, during the charge conference, addressed with counsel the substance of the flight charge. As part of the court's final charge to the jury, it included the model jury instruction on flight.[8] <u>See</u> <u>Model Jury Charges (Criminal)</u>, "Flight" (rev. May 10, 2010). Defendant did not object to the substance of the charge as instructed by the court.

---

[8] The court deviated from the model jury charge by including a sentence distinguishing the jury's consideration of flight as evidence of consciousness of guilt and flight as an element of the kidnapping offense for which defendant was charged. Defendant does not challenge the inclusion of the sentence, or the distinction it made, on appeal.

A-0432-17T4

"The appropriate time to object to a jury charge is 'before the jury retires to consider its verdict.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 1:7-2). Where a defendant fails to object to a jury charge at trial, we review for plain error and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). "To warrant reversal . . . , an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

For the first time on appeal, defendant claims the flight instruction improperly shifted the burden to him to prove the reason for his flight and to "disprove flight in order to avoid the damaging consciousness-of-guilt inference." Defendant also argues the court erred by giving the flight instruction prior to instructing the jury on the substantive offenses, including the State's burden of proving the elements of the offenses charged beyond a reasonable doubt. We find defendant's arguments are without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(2), beyond the following brief comments.

A-0432-17T4

The court's flight charge was comprised of a nearly verbatim restatement of the model jury charge, which is consistent with our Supreme Court's standard for an instruction on "the inferences the jury may draw" from evidence of flight as consciousness of guilt. State v. Mann, 132 N.J. 410, 420 (1993). As the Court explained in Mann, an instruction on flight requires the jury "first . . . find that there was a departure, and then to find a motive for the departure . . . that would turn the departure into flight." Id. at 421. The Court further explained that if the defendant "offers an explanation for the departure, the trial court should instruct the jury that if it finds the defendant's explanation credible, it should not draw any inference of the defendant's consciousness of guilt from the defendant's departure." Ibid.

The model jury charge is in precise accord with the Court's instructions in Mann, and, contrary to defendant's claim, the charge did not expressly or implicitly impose any burden of proof on defendant or any requirement that he disprove anything. The instruction merely explained the manner in which the jury should consider the evidence, but only if it first determined "defendant, fearing that an accusation or arrest would be made against him on the charge involved in this indictment, took refuge in flight for the purpose of evading the accusation or arrest." See, e.g., State v. Randolph, 228 N.J. 566, 594-95 (2017)

16

(explaining "[f]light will have 'legal significance' if the circumstances 'reasonably justify an inference that it was done with a consciousness of guilt'" (quoting State v. Ingram, 196 N.J. 23, 46 (2008))); see also State v. Latney, 415 N.J. Super. 169, 175-76 (App. Div. 2010) (same). The instruction did not impose any burden on defendant or define any elements of the offenses for which he was charged.

In reviewing the adequacy of a court's charge to the jury, we must consider the charge as a whole in determining whether it is prejudicial. See State v. Figueroa, 190 N.J. 219, 246 (2007). As part of its final charge to the jury, the court repeatedly stated the State has the burden of proving the elements of the offenses charged beyond a reasonable doubt and that the burden "never shifts to [ ] defendant." There is nothing in the court's flight instruction suggesting anything to the contrary.

We therefore find no error in the model jury charge or in the court's use of it to instruct the jury on flight as consciousness of guilt. See State v. Montalvo, 229 N.J. 300, 320 (2017) (finding where a defendant does not object to the charge, "'there is a presumption that the charge was not error and was unlikely to prejudice . . . defendant's case'" (quoting State v. Singleton, 211 N.J. 157, 182 (2012))); State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div.

2008) ("When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000))); see also State v. Rodriguez, 365 N.J. Super. 38, 53-54 (App. Div. 2003) (finding no error in a jury charge reciting verbatim a model jury charge consistent with New Jersey precedent).

## B.

During the presentation of the State's case, Newark Police homicide detective Murad Muhammad testified about the investigation leading to defendant's arrest. Early in the investigation, Muhammad reviewed surveillance recordings from Slick's that "contain[ed] the actual shooting." During the playing of one of the recordings at trial, the prosecutor questioned Muhammad as follows:

> PROSECUTOR: Now, Detective, you've viewed this video before; correct?
>
> MUHAMMAD: Yes.
>
> PROSECUTOR: Were you able to make any sort of determination with regards to the shooter, upon your viewing of this video?
>
> MUHAMMAD: Yes.

18

PROSECUTOR: And can you tell us what . . . some determinations that you made with regard to this particular video. Of the shooter.

. . . .

PROSECUTOR: What determinations did you make, Detective?

MUHAMMAD: The identity of the -- who the shooter was.

PROSECUTOR: Identity in what sense?
MUHAMMAD: Who murdered the people at Slick's.

PROSECUTOR: And is that by the body type?

DETECTIVE MUHAMMAD: Yes.

Defendant argues the recordings were of poor quality; Bogar's, Neal's, Adolphe's, and Duvivier's identifications of him as the shooter "were less than rock-solid"; and the State impermissibly buttressed its case by having Muhammad testify he identified defendant as the shooter. Defendant claims Muhammad's testimony constituted either inadmissible lay opinion, see N.J.R.E. 701, or expert opinion, see N.J.R.E. 702, because it constituted an opinion concerning defendant's identity and guilt.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. State v. Buckley, 216 N.J. 249, 260 (2013). Where, as here, defendant did not object to the challenged testimony, if the evidence was

admitted in error we also must determine whether its admission is "plain error. We may reverse on the basis of unchallenged error only if the error was 'clearly capable of producing an unjust result.'" See State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2). "To warrant reversal . . . an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Funderburg, 225 N.J. at 79 (citation omitted) (quoting Jenkins, 178 N.J. at 361).

Defendant's argument is based on the inaccurate factual premise that Muhammad opined defendant was the shooter and was guilty. A plain reading of the questions posed by the prosecutor and Muhammad's responses demonstrates otherwise. Neither the prosecutor nor Muhammad mentions defendant; Muhammad does not identify defendant on the video recording or otherwise as the shooter; and Muhammad does not opine on defendant's guilt.

We also reject defendant's claim that despite the lack of any reference to defendant as the shooter, "the sole and inexorable inference from the detective's testimony that he identified the shooter was that he had determined it was" defendant. The argument is undermined by the record.

The prosecutor inquired about Muhammad's investigation and whether, based on his review of the recording, he made "any determinations with regards

to the shooter." Muhammad explained he made a determination as to "the identity of the . . . shooter," but the prosecutor did not ask if Muhammad identified a particular person as the shooter and Muhammad never said he identified defendant or anyone else as the shooter. To the contrary, the prosecutor asked only "in what sense" had Muhammad determined the "identity" of the shooter, and Muhammad vaguely explained it was "by the body type." Muhammad did not suggest his determination about the shooter's body type resulted in defendant's identification or that he relied on the determination to take any other actions during the investigation. Cf. State v. Lazo, 209 N.J. 9, 21-22 (2012) (finding improper detective's testimony explaining why he put a defendant's photo in an array because it "enhanced the victim's credibility and intruded on the jury's role").

In sum, we are not convinced Muhammad's vague reference to his determination concerning the identity of the shooter by his or her body type constituted an opinion concerning defendant's identity as the shooter, defendant's guilt, or anything else. He testified he made a determination, but he did not explain it in any discernable manner related to defendant, and he did not offer any opinions based on it. Thus, we find no abuse of discretion in the court's admission of the testimony.

Moreover, even accepting defendant's claim Muhammad's testimony may have been interpreted in some inexplicable manner as an opinion about defendant's identity or guilt, we do not find its admission raises "a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Ross, 229 N.J. at 407.

Defendant correctly argues identification was the central issue at trial, but the identification evidence against him was overwhelming. Defendant was separately and independently identified as the shooter by four different witnesses, one of whom knew defendant prior to the shootings. In her statement to the police following the shooting, Sapini, who arrived at the bar that evening with defendant, explained that defendant, armed with a handgun, entered Bogar's car immediately following the shooting. Defendant was also identified on the video recordings by the mother of his children, and the jury was able to review the recordings during the trial. Muhammad's vague testimony about a determination he made about the shooter's body type added nothing, and the testimony, even if improper, does not raise reasonable doubt that its admission led to a result the jury would not have otherwise reached. See Ross, 229 N.J. at 407; R. 2:10-2.

C.

Defendant argues his aggregate ninety-nine-year sentence is excessive, constitutes a de facto life sentence, and is an unconstitutional cruel and unusual punishment. He contends the court erred by failing to consider his age—nineteen—in its sentencing determination, and by failing to apply the standards for imposition of consecutive sentences established in State v. Yarbough, 100 N.J. 627 (1985).

Our review of a court's sentencing decision "is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We "must affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

We are further "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent

credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989). An appellate court should modify a sentence "only when the trial court's determination was 'clearly mistaken.'" State v. Jabbour, 118 N.J. 1, 6 (1990) (quoting State v. Jarbath, 114 N.J. 394, 401 (1989)).

Defendant argues that, because he was nineteen years old when he committed the offenses for which he was convicted, the sentencing court was required to apply the principles established in Miller v. Alabama, 567 U.S. 460 (2012), and State v. Zuber, 227 N.J. 422 (2017), for the determination of a juvenile's sentence that is "the practical equivalent of life without parole," Zuber, 227 N.J. at 429. We reject the argument because Miller and Zuber considered sentencing principles applicable to juveniles, and defendant was an adult when he committed the murder, two aggravated manslaughters, and two aggravated assaults for which he was convicted and sentenced. See N.J.S.A. 2A:4A-22(a) (defining, under the Code of Juvenile Justice, a "[j]uvenile" as "an individual who is under the age of 18 years"). The principles addressed and established in Miller and Zuber are inapposite here.

Although the court correctly rejected defendant's reliance on Miller and Zuber, it nonetheless considered defendant's age and the Zuber factors in its sentencing decision. In Zuber, the Court explained that a court determining

whether to impose a lengthy term of imprisonment for a juvenile "should consider factors such as [the] defendant's 'immaturity, impetuosity, and failure to appreciate risks and consequences'; 'family and home environment'; family and peer pressures; 'inability to deal with police officers or prosecutors' or his own attorney; and 'the possibility of rehabilitation.'" 227 N.J. at 453 (quoting Miller, 567 U.S. at 478).

Here, the court addressed defendant's "chronological age and its hallmark features[,]" Zuber, 227 N.J. at 445 (quoting Miller, 576 U.S. at 477), noting defendant's "immaturity, impetuosity, and failure to appreciate risks and consequences" and that, at age nineteen, defendant made decisions he would not make with more "worldly experience." The court also considered defendant's family environment and family and peer pressures, see ibid., concluding defendant's family environment appeared "entirely solid" and there was no evidence family or peer pressure played any part in defendant's crimes. To the contrary, the judge found defendant's "independent act or decision to . . . rachet it up into a homicidal act was that in the mind of [defendant] . . . alone."

The court further found defendant's actions suggested a level of "some sophistication," explaining defendant left the jurisdiction following the shootings. The court also addressed defendant's prospect for rehabilitation,

explaining that was the "only factor that really mitigates in any significant form towards [defendant]" because, as a young man, rehabilitation is "more likely to occur as [a] . . . youthful offender ages and neurological development increases." Thus, contrary to defendant's contention, the court considered defendant's age, characterizing it as "a non-statutory mitigating factor," and defendant's potential for rehabilitation in its sentencing calculus.[9]

In addition to its consideration of defendant's age, the court found and weighed the aggravating and mitigating factors under N.J.S.A. 2C:44-1(a) and (b). The court's findings are supported by the record. Bolvito, 217 N.J. at 228 (explaining a court's finding of aggravating and mitigating factors must be supported by competent record evidence). The court found aggravating factor three, the risk defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3).

---

[9] Although age is not distinctly identified as a factor to be considered under our sentencing statutes, see, e.g., N.J.S.A. 2C:44-1(a) and (b), a court may properly consider a defendant's age in its assessment of mitigating factors two, "[t]he defendant did not contemplate that his conduct would cause or threaten serious harm," N.J.S.A. 2C:44-1(b)(2); four, "[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense," N.J.S.A. 2C:44-1(b)(4); eight, "[t]he defendant's conduct was the result of circumstances unlikely to recur," N.J.S.A. 2C:44-1(b)(8); and thirteen, "[t]he conduct of a youthful defendant was substantially influenced by another person more mature than the defendant," N.J.S.A. 2C:44-1(b)(13). Here, however, defendant presented no evidence, other than he was nineteen when the crimes were committed, supporting a finding of any of these mitigating factors.

As noted by the sentencing court, the factor is supported by evidence showing defendant's prior minor brush with the law—a 2013 municipal court conviction—did not dissuade him from committing the knowing and purposeful murder, aggravated manslaughters, aggravated assaults, and weapons offenses for which he was convicted. Although the court did not expressly correlate defendant's failure to accept any responsibility for his actions and lack of any remorse as a basis for its finding of aggravating factor three, those facts also support its finding there is a risk defendant will commit another offense. See State v. Carey, 168 N.J. 413, 427 (2001) (finding defendant's failure to accept responsibility for his crimes "does not irrefutably prove that [the] defendant is likely to re-offend, but it does provide support for" such a conclusion).

The evidence also supports the court's finding of aggravating factor nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The court found there was a need for general and specific deterrence because defendant engaged in gun violence, caused the death of three individuals, and caused long-lasting injuries to two others. The court correctly noted that the need for deterrence increases proportionately with the degree of the offenses for which a defendant is sentenced, and that defendant committed the most serious crime found in our Criminal Code, knowing and purposeful

27

murder, as well as two aggravated manslaughters and two aggravated assaults. See Carey, 168 N.J. at 427; see also State v. Megargel, 143 N.J. 484, 501 (1996) ("[D]emands for deterrence are strengthened in direct proportion to the gravity and harmlessness of the offense and the deliberateness of the offender." (citation omitted)).

The court further appropriately considered "defendant's role in the incident to determine" there was a "need to deter him from further crimes and the corresponding need to protect the public from him." Megargel, 143 N.J. at 501. "As the Court has held, '[t]he paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protection and the more need for deterrence.'" State v. Fuentes, 217 N.J. 57, 74 (2014) (alteration in original) (quoting Megargel, 143 N.J. at 500). Here, the number and seriousness of the crimes defendant committed support the court's finding of aggravating factor nine.

The court found mitigating factor seven, defendant has no prior history or prior delinquency or criminal activity and lead a law-abiding life for a substantial period of time prior to the commission of the present offenses, N.J.S.A. 2C:44-1(b)(7). The court explained that but for his municipal court

conviction, defendant had led a law-abiding life, and concluded defendant's record supported a finding of the factor.

The court's weighing of the factors also finds support in the record. The court weighed defendant's age and "lack of . . . criminal sophistication" against the need for general and specific deterrence, to which the court assigned heavy weight. The court further found the aggravating factors preponderated over the mitigating factors. We discern no basis to "second guess" the court's findings and determination, see Megargel, 143 N.J. at 494 ("Judges who exercise discretion and comply with the principles of sentencing remain free from the fear of 'second guessing.'" (citation omitted)), because they are supported by the record.

We also find no abuse of the court's discretion in its imposition of the terms of imprisonment for each of the offenses. The court's finding the aggravating factors preponderate over the mitigating factors supported the terms of imprisonment imposed for each of the offenses.

We reject defendant's assertion the court erred by imposing consecutive sentences for the murder, two aggravated manslaughters, and two aggravated assaults. Defendant argues that because the indictment charged defendant with three counts of murder but the jury convicted him of only one count of murder,

the jury found defendant had only one purpose—to kill Daniel—and therefore, "the crimes and their objectives were <u>not</u> predominantly independent of each other[.]" Defendant claims that "[b]y rejecting murder convictions for two of the decedents and returning manslaughter verdicts for them, the jury concluded that their deaths were the reckless byproduct of the singular objective to kill the third victim." Moreover, defendant contends that his crimes were committed so closely in time and place as to indicate a single period of aberrant behavior.

When a defendant receives multiple sentences of imprisonment "for more than one offense, . . . such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a). The statute does not define when consecutive or concurrent sentences are appropriate. In <u>Yarbough</u>, the Court set forth the following guidelines for determining whether a consecutive sentence is appropriate:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]

[100 N.J. at 643-44 (footnote omitted).]

"A sixth factor, which imposed 'an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms,' was eliminated by the Legislature in a 1993 amendment to" N.J.S.A. 2C:44-5(a).  State v. Liepe, 239 N.J. 359, 372 n.4 (2019).  The statute now provides "[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses."  N.J.S.A. 2C:44-5(a).

31

The court's imposition of consecutive terms for the murder, two counts of aggravated manslaughter, and two counts of aggravated assault was based on a reasoned application of the Yarbough standards. Although we find the court's determination the crimes were not committed so closely in time as to indicate a single period of aberrant behavior is not supported by the record, the court's other findings support its imposition of consecutive terms for what it found were crimes involving "separate acts of violence or threats of violence" involving "multiple victims." See, e.g., Carey, 168 N.J. at 427-28 (explaining a consecutive sentence can be imposed even if a majority of the Yarbough factors support concurrent sentences).

"[C]rimes involving multiple victims represent an especially suitable circumstance for the imposition of consecutive sentences because the 'total impact of singular offenses against different victims will generally exceed the total impact on a single individual who is victimized multiple times.'" State v. Molina, 168 N.J. 436, 442 (2001) (quoting Carey, 168 N.J. at 428). Thus, "the multiple-victims factor is entitled to great weight and should ordinarily result in the imposition of at least two consecutive terms when multiple deaths or serious bodily injuries have been inflicted upon multiple victims by the defendant." Carey, 168 N.J. at 429-30. As the Court has explained, a "core principle" in

32

determining whether to impose consecutive sentences is that "by virtue of their impact on multiple lives, crimes involving two or more victims are particularly suited for the imposition of consecutive sentences." Liepe, 239 N.J. at 375. That principle "resonates most clearly in cases in which a perpetrator intentionally targets multiple victims" but it also applies in "cases in which . . . the defendant does not intend to harm multiple victims but it is foreseeable that his or her reckless conduct will result in multiple victims." Ibid. (quoting Carey, 168 N.J. at 429).

Defendant caused the death of three individuals and bodily injury to two others. The court correctly determined defendant's violent crimes committed against five separate victims constituted separate crimes for which consecutive sentences were appropriate. We are therefore satisfied the court's application of the Yarbough factors and decision to impose consecutive sentences for the five violent crimes for which defendant was convicted was supported by the record, see, e.g., id. at 377-78 (finding three consecutive custodial sentences were warranted where there were "injuries inflicted on multiple victims"); Carey, 168 N.J. at 430-31 (finding it "appropriate to impose consecutive sentences on defendants" whose crimes "result in multiple deaths or multiple persons sustaining serious personal injuries"), and not so wide of the mark as to require

A-0432-17T4

our intervention, see ibid. (applying abuse of discretion standard to review a trial court's imposition of consecutive sentences).

The fairness of the overall sentence should be considered in reviewing the imposition of consecutive sentences, State v. Sutton, 132 N.J. 471, 485 (1993), and defendant argues his aggregate ninety-nine-year sentence should shock our judicial conscience and constitutes cruel and unusual punishment. To be sure, the court imposed a very long sentence, but the sentence's validity is not measured by its length. A determination of whether a sentence shocks the judicial conscience requires consideration of the court's "application of the guidelines to the facts of [the] case." Fuentes, 217 N.J. at 70. The court properly applied the sentencing guidelines to defendant's unspeakable and indiscriminate gun violence that resulted in the death of three innocent victims and bodily injury to two others. As the Court explained in Liepe, "defendant may spend the rest of his life in jail[,]" however, the trial court's task "was not to ensure defendant's eventual release, but to devise a sentence commensurate with defendant's crimes." 239 N.J. at 379. Because the "consecutive terms do not violate statutory or judicial guidelines for sentencing," and the aggregate term imposed "do[es] not shock the judicial conscience[,]" we find the court did not abuse its discretion. Ibid.

Any other arguments made by defendant that we have not expressly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION