# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1903-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

EDWARD RASKIN, a/k/a
EDWARD GINSBURG,

     Defendant-Appellant.

_____

> Argued June 8, 2022 – Decided June 23, 2022
>
> Before Judges Hoffman, Geiger, and Susswein.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 18-07-0433.
>
> Patricia B. Quelch argued the cause for appellant (Helmer, Conley & Kasselman, PA, and Fernandez Garcia, LLC, attorneys; Michael Garcia, of counsel; Patricia B. Quelch, of counsel and on the brief).
>
> Michele C. Buckley, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Michele C. Buckley, of counsel and on the brief).

PER CURIAM

Defendant Edward Raskin, a previously licensed acupuncturist, appeals from his conviction and sentence for sexually assaulting and criminally sexually contacting a patient, L.V. (Lori).[1] We affirm in part, vacate in part, and remand.

I.

A Union County grand jury issued an indictment charging defendant with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), against the same victim on December 30, 2017.

The State moved to permit J.C., the victim's mother, to testify as a fresh complaint witness pursuant to N.J.R.E. 803(c)(2). Defendant opposed this motion. The court conducted a N.J.R.E. 104 hearing. Defendant argued that a portion of J.C.'s statement was tainted because detectives showed her Lori's statement and the police report. Defendant acknowledges that at the time of this hearing, his trial strategy was not generally known. The court issued a written order and written decision granting the motion. The court found that J.C. was a "natural confidante" based on their close relationship and living together at the

---

[1] We refer to the victim and certain witnesses by initials or pseudonyms to protect the identity of the victim. R. 1:38-3(c)(9); N.J.S.A. 2A:82-46.

A-1903-20

time of the offense, and it was "clear" that J.C. was someone Lori would turn to for "sympathy, protection, or advice." The court found Lori's disclosure "to her mother [was] made within a reasonable time after the alleged sexual assault." The court also found that the disclosure was "voluntary" and "not in response to any coercive questioning by [J.C.]." "Rather, [Lori] volunteered the details about what happened, unprompted by any questioning."

The court noted that J.C. was not shown Lori's statement until after "[J.C.] had already informed the officer that her daughter had told her that the acupuncturist had 'sexually molested' [Lori]' and 'that's when my mind went off.'" The court found "[J.C.] credible with regard to her daughter making an almost immediate complaint to her regarding an unwanted touching of a sexual nature during her acupuncture treatment on December 30, 2017." The court reminded the State "that only the facts that are minimally necessary to identify the subject matter of the complaint should be admitted; the fresh complaint testimony is not to be used 'to corroborate the victim's allegations concerning the crime.'" (quoting State v. Bethune, 121 N.J. 137, 146 (1990)).

Defendant waived his right to a jury trial. We take the following facts from the evidence presented at trial. Defendant was a licensed acupuncturist practicing in New Jersey and New York. Beginning on October 15, 2017, and

ending on December 30, 2017, Lori sought treatment for pain in her right shoulder through acupuncture and was treated by defendant at his office in Springfield.

During her first appointment, defendant assessed Lori's injury and explained how he would treat Lori's shoulder and asked her to enter a treatment room. Lori entered the room, removed her shirt but left on her sports bra, leaving her shoulder uncovered for insertion of the acupuncture needles. Defendant entered the room, inserted the acupuncture needles, connected the needles to a machine, and after leaving the room, checked on Lori periodically. The treatment lasted about one hour. Defendant asserts there was only minimal improvement from the first treatment, and he showed Lori stretching exercises to do between her weekly appointments. This treatment session set the pattern for subsequent appointments.

Defendant and Lori agree that during the third appointment, defendant added massage to Lori's treatment program, focusing on her right shoulder. During the massage portion of the fourth or fifth visit, defendant decided that Lori's bra strap was interfering with the success of the massage, and asked Lori if he could unhook her bra. After this visit, Lori assumed that her bra would be

4

too restrictive for later treatments, so she began removing her shirt and bra and then lying face down on the treatment table each time.

During Lori's ninth appointment, defendant told her that a key acupuncture point ran from the nipple of the breast to the back. Lori allowed defendant to pull her right shoulder up from the table and run the side of his hand from her nipple to her back, for the purpose of treatment. When Lori went home that day, she researched whether this type of treatment was legitimate and found it was accepted practice.

Lori's last appointment with defendant was on December 30, 2017. The events on that day led to the charges filed against defendant. Lori arrived, was led to the treatment room, and undressed behind the privacy curtain as usual. The acupuncture treatment proceeded as normal. As usual, defendant then began to massage Lori's shoulder, and ran his hand from her nipple to her back. Defendant then slid his arms under her breasts and squeezed her breasts three or four times. Lori quickly pulled her arms and elbows to her sides and remained frozen on her stomach. Defendant continued massaging Lori. Because she was stunned by her breasts being squeezed, Lori was unable to express her fears.

Defendant then slipped his hands under the waistband of Lori's sweatpants and massaged her buttocks and thighs. Defendant admitted he grazed Lori's

5

vagina with his hand over her underwear. Lori responded by stating: "Whoa." Defendant apologized while removing his hands from her pants but continued massaging her back. Lori remained frozen when defendant pulled down Lori's sweatpants and underwear. Defendant rubbed Lori's legs and inserted his finger into her vagina. When Lori told defendant "No" he again apologized. Lori then turned onto her side, pulled her legs into her chest, and assumed a fetal position. Defendant then lifted Lori's leg and licked her vagina. Lori again told defendant to stop, and defendant left the room. Lori then got dressed and left the office.

Once at home, Lori told her mother, J.C., that she had been "molested" and explained what happened. Lori then went to her girlfriend E.C.'s house and told her what happened. The next day, December 31, 2017, Lori and E.C. went to the police to report the sexual assault. Lori was interviewed by a female officer and gave a full statement. Lori's mother, J.C., went to the police station a few days later to give a recorded statement and to turn over the underwear that Lori wore on December 30.

Lori and defendant's later recounting of the December 30 events are consistent up until the last half-hour of the treatment session. Defendant reported that he kissed Lori's thigh whereas Lori reported that defendant inserted his fingers into her vagina and licked her vagina.

A-1903-20

On January 4, 2018, defendant sent Lori a text message. Defendant stated he had herbs for Lori's father. Defendant explained he was from Belarus and Lori told him that her father worked in Russia for a while and was currently experiencing health issues. Lori explained she was just making "polite conversation," but defendant took it upon himself to get her father the herbs. Lori showed the text message to the police, and they arranged for her to make a telephone call that would be recorded. The recorded phone call took place on February 15, 2018. During the call, Lori stated that she wanted to return to the office for treatment, but that sexual conduct was inappropriate, and she would not tolerate it happening again. Defendant responded, "I understand," "Yeah, you have my word that's not, you know – nothing like that." Defendant states he suffers from hearing loss and when Lori told him that she did not want to be probed, he took that to mean she did not want "his manipulation of her shoulder following treatment." Lori had no further contact with defendant after this call.

Defendant testified and recounted most of the same facts as Lori had. Defendant admitted that on November 4, 2017, after Lori removed her shirt and bra and was laying on her stomach for treatment, defendant entered the treatment room and was attracted to Lori, stating she had a "beautiful body." Defendant admitted that while the massages he administered following acupuncture

A-1903-20

treatments had a general "medical purpose," they were also partly "intimate massages" because "[he] was touching her breasts" which was not "medically necessary." Defendant stated he cupped Lori's breasts on those occasions because he "thought she was enjoying it[.]"

Regarding the appointment on December 30, defendant testified that after the acupuncture treatment, he began massaging Lori's shoulder and lower back. He then massaged her left thigh and when he moved his hand further up, Lori stated, "whoa or wow" and defendant testified he believed he accidentally pressed too hard on an acupuncture point and apologized. Defendant stated there is an acupuncture point near the vagina called "CV1" which is located between the genitals and anus, but it is unclear whether a needle was previously inserted there or if the acupuncture treatment there related to the shoulder region. Defendant continued to massage Lori's body, mainly her "lower back, the buttocks, and upper thighs in the back" for another ten to fifteen minutes "just to continue the intimate touch." Defendant testified that Lori then lowered her pants and rolled to her side at which point, defendant fully removed her pants and placed them on a table. Defendant then caressed Lori's right thigh and "instinctively went down and kissed" the inside of her left thigh. Defendant told Lori that she had a beautiful body and she said: "Come on, Ed." Defendant

A-1903-20

believed Lori did not want to "continue the intimate part anymore." Defendant admitted that the massage was not "medically necessary" but was part of their "intimate relationship which progressed and evolved over the course of the [] number of treatments."

On cross-examination, defendant admitted that during the time Lori was seeking treatment, they did not call, text, or email each other and never met outside of the office.

Defendant called Lori's girlfriend, E.C., as a witness. The court sustained numerous other objections based on lack of relevance or because the questions called for hearsay. Near the end of his direct examination, defense counsel twice attempted to question E.C. through leading questions. The State objected on those two occasions. Defense counsel did not request the court to declare E.C. a hostile witness. The objections were sustained by the court. The court noted the witness was answering the questions. On redirect, defense counsel did not attempt to ask leading questions.

Both the State and defendant presented DNA expert testimony regarding samples that were recovered from Lori's underwear. The State's expert testified that she performed tests on the underwear to look for the presence of amylase, an enzyme found in human saliva and DNA. The underwear was sent for

9

forensic testing and revealed DNA from two males, one of whom was defendant. The underwear was negative for saliva. The State's expert testified that defendant could not be excluded as a possible contributor to the mixture of DNA that was found on the underwear. Defendant's expert testified that there was the possibility of transference of DNA from a person's thigh to their underwear. Both experts acknowledged that improper handling of the underwear could have affected the results.

On February 3, 2020, the court issued an oral decision that began by recounting the facts. Regarding the sexual assault charge, the court explained the elements of the offense and its credibility findings, including the believability of Lori's version of events and the "incredible" nature of defendant's "self-serving" version.

The court noted that if defendant and Lori had an intimate relationship, why then did defendant follow "proper protocol" of treatment by walking Lori to the treatment room, leaving her alone to change, and only entering when she was ready and lying face down. The court questioned why there were there no communications between the two, especially when Lori missed several appointments because of pneumonia. The court also questioned why "no one

A-1903-20

else in the office" reacted to defendant's actions if he was in an intimate relationship with a patient.

The court found defendant's version of the December 30 incident was "incredible" because there was "no way" defendant believed he accidentally touched Lori's CV1 spot during the massage. The court also found defendant's "explanation of how [Lori's] sweatpants were removed that day" was also "incredible" and that defendant attempted to "spin it to his favor" to "comport with [Lori's] testimony."

The court found the State had proven beyond a reasonable doubt that defendant committed an act of sexual assault through insertion of his finger in Lori's vagina and by performing cunnilingus on her.

The court likewise found defendant guilty beyond a reasonable doubt of criminal sexual contact, "when he scooped his hands under and squeezed [Lori's] breasts, as well as when he touched her vagina" without Lori "freely and affirmative[ly] giv[ing] permission for the defendant to touch her."

Defendant subsequently moved for a directed verdict and, in the alternative, for a new trial. The court limited defendant's conviction for criminal sexual contact to his touching the victim's vagina and not the touching of her

A-1903-20

breasts because defendant was not put on notice of that allegation. The State agreed with that limitation during the motion hearing.

The court denied the motions, finding there had been "no denial of justice." The court reiterated that it did not find defendant's testimony credible and even if he had not testified, Lori was "very credible." Because defendant chose to testify, the court explained it was permitted to "rely on his complete lack of veracity."

Defendant was sentenced on February 25, 2021. The court found aggravating factor nine (need for deterrence), N.J.S.A. 2C:44-1(a)(9), and mitigating factors seven (no prior delinquency or criminal record), eight (defendant's conduct resulted from circumstances unlikely to recur), and nine (defendant unlikely to reoffend), N.J.S.A. 2C:44-1(b)(7), (8), and (9), and was clearly convinced that the mitigating factors outweighed the aggravating factors.

The court rejected defendant's request to sentence count one in the third-degree range. The court noted that it "[did] not find that the mitigating factors substantially outweigh the aggravating factors" and considering the severity of the offense, did not find any compelling reasons that demanded a downgrade in the interests of justice.

12

Without engaging in a full analysis, the court declined to merge the criminal sexual contact conviction into the sexual assault conviction, noting that the criminal sexual contact "is different that penetration or cunnilingus." The court recognized, however, that both offenses occurred during "one incident."

Defendant received a five-year term on the second-degree sexual assault, subject to the eighty-five percent period of parole ineligibility and mandatory parole supervision under the No Early Release Act, N.J.S.A. 2C:43-7.2. Defendant was required to comply with the registration requirements imposed by Megan's Law, N.J.S.A. 2C:7-1 to -23, and placed on parole supervision for life, N.J.S.A. 2C:43-6.4. Defendant received a concurrent one-year term on the fourth-degree criminal sexual contact. Appropriate fines, penalties, and assessments were applied. This appeal followed.

Appellant raises the following points for our consideration:

POINT I

THE TRIAL COURT'S DECISION IS BASED UPON CREDIBILITY FINDINGS NOT SUPPORTED BY THE FACTS PRESENTED AT TRIAL.

POINT II

THE COURT ERRED BY ALLOWING [J.C.] TO TESTIFY AS A FRESH COMPLAINT WITNESS.

A-1903-20

POINT III

DEFENDANT WAS DENIED A FAIR TRIAL BY CUMULATIVE ERRORS AND IRREGULARITIES.

POINT IV

DEFENDANT'S SENTENCE IS EXCESSIVE.

## II.

We first address defendant's claim that that the trial court's decision is based upon credibility findings not supported by evidence adduced at trial. Defendant challenges the court's finding that the victim was credible, and he was not.

Our review of a judge's verdict following a bench trial is limited. The standard is not whether "the verdict was against the weight of the evidence," but rather "whether there is sufficient credible evidence in the record to support the judge's determination." State in the Int. of R.V., 280 N.J. Super. 118, 120-21 (App. Div. 1995). We are obliged to "give deference to those findings of the trial judge which are substantially influenced by [the] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.'" State v. Locurto, 157 N.J. 463, 471 (1999) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility."

A-1903-20

Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "We will set aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)).

"A trial court's interpretation of the law, however, and the consequences that that flow from established facts are not entitled to any special deference. A trial court's legal conclusions are reviewed de novo." Hubbard, 222 N.J. at 263.

Applying these standards, we discern no basis to disturb the trial court's factual findings and credibility determinations, which are amply supported by the credible evidence presented at trial. The court made detailed findings, including setting forth examples of the testimony it found most significant, and the aspects of defendant's testimony that were not believable. The fact that much of defendant's testimony was consistent with the victim's does not undermine the court's conclusion that his testimony on critical facts was not credible where it diverged from the victim's. Based on our careful review of the record, we are convinced that the court's findings "could reasonably have been reached on sufficient credible evidence present in the record." Johnson, 42 N.J. at 162. Accordingly, our "task is complete." Ibid. Defendant's attempts to bolster his credibility, attack the victim's veracity, and attack the trial court's credibility

findings lack sufficient merit to warrant further discussion in this opinion.  R. 2:11-3(e)(2).

### III.

We next address defendant's argument that the court erred by permitting J.C. to testify as a fresh complaint witness.  He contends that by the time of trial, "it was evident that the defendant had no intention of denying that certain intimate contact had taken place on December 30, 2017."  Defendant asserts that based on this admission, there was no need for a fresh complaint witness to testify.  We reject this argument.

We review a trial court's evidentiary rulings for abuse of discretion, as "the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion."  State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)).  Trial judges have broad discretion in ruling on evidentiary questions.  State v. Harris, 209 N.J. 431, 439 (2012).  Appellate courts may not substitute their own judgment for the trial court's absent a "clear error in judgment" so erroneous that "a manifest denial of justice resulted."  State v. Scott, 229 N.J. 469, 479 (2017) (quoting State v. Perry, 225 N.J. 222, 233 (2016)).  We disregard harmless errors, bur errors capable of causing an unjust result the jury "otherwise might

not have reached" require reversal.  Prall, 231 N.J. at 581 (quoting State v. Daniels, 182 N.J. 80, 95 (2004)).

The fresh complaint doctrine allows "evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015); see also State v. Hill, 121 N.J. 150, 163 (1990) (noting that "fresh-complaint evidence serves a narrow purpose . . . [to] allow[] the State to negate the inference that the victim was not sexually assaulted because of her silence").  Consistent with that limited purpose, "the fresh complaint testimony is not to be used 'to corroborate the victim's allegations concerning the crime.'"  R.K., 220 N.J. at 456 (quoting Bethune, 121 N.J. at 146).

A jury, or a court sitting without a jury, may not consider fresh-complaint testimony "as substantive evidence of guilt, or as bolstering the credibility of the victim; it may only be considered for the limited purpose of confirming that a complaint was made."  Ibid.  For that reason, the testimony must exclude details of the assault that the complaint may have conveyed.  "Only the facts that are minimally necessary to identify the subject matter of the complaint should be admitted."  Ibid.  Also, given the testimony's "narrow purpose of negating

inferences that the victim had failed to complain," a trial court must "assess . . . whether repeated testimony of the victim's complaint is irrelevant or prejudicial to the defendant." Hill, 121 N.J. at 169. "[T]o qualify as fresh complaint, the victim's statements to someone she would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary." Id. at 163.

Here, after hearing the testimony at the Rule 104 hearing, the trial court found J.C. to be credible and that J.C., the victim's mother who she lived with, was obviously a "natural confidante" and is someone that she would turn to for "sympathy, protection, or advice." The court also found that the fresh complaint was made within a reasonable time after the alleged sexual assault and was voluntary and not the product of any coercive questioning. These findings are amply supported by the record.

Defendant takes issue with the fact that J.C.'s statement was "tainted" because detectives showed Lori's statement and the police report to J.C. but at the same time acknowledges that the tainted portions were not introduced at trial. Moreover, the court found that J.C. was not shown Lori's statement until after J.C. disclosed the fresh complaint information to police.

A-1903-20

At trial, J.C.'s testimony was limited in scope to Lori's demeanor when she arrived home after her acupuncture appointment on December 30, and her statement that defendant sexually assaulted her, massaged her breasts, and licked her. J.C. followed the prosecutor's instruction that she could not present any details of their conversation.

The trial court described the fresh complaint testimony and its limited use:

> [J.C.], [the victim's mother] also testified as a fresh complaint witness. She explained that on December 30th her daughter came home sometime in the afternoon while she was in the living room watching television.
>
> [J.C.] testified that [Lori] looked very sad and was very quiet when she . . . returned home from her appointment and went straight to her bedroom. When [Lori] did return to the living room she told her that the defendant had sexually assaulted her[.]
>
> This [c]ourt has only considered this fresh complaint evidence to counter any inference that might be drawn that [Lori's] behavior was inconsistent with the claim of sexual abuse. It is not considered to bolster [Lori's] credibility or prove the underlying truth of sexual assault charges. I did find [J.C.] to be a credible witness.

The fresh complaint testimony was properly admitted, appropriately considered by the trial court, and not used to bolster Lori's credibility. We discern no abuse of discretion or clear error in judgment.

A-1903-20

IV.

Defendant's remaining arguments regarding alleged trial errors lack sufficient merit to warrant extended discussion.  R. 2:11-3(e)(2).

Defendant contends he was denied a fair trial by cumulative errors and irregularities, including the prejudicial effect of inadmissible testimony and bias towards the defendant.  Defendant argues: (1) Lori testified contradictorily through hand motions on the stand from her prior statement to police on December 31, 2017; (2) the court was biased against him because the court stated she was "watching" him; (3) the court should not have accused him of tailoring his testimony to Lori's testimony or allowed this to factor into her credibility assessments; (4) the court improperly questioned Lori during her testimony; (5) the court employed a preponderance of the evidence standard rather than deciding his guilt beyond a reasonable doubt; (6) the trial court abused discretion in limiting cross-examination of Lori and direct examination of her girlfriend, E.C.; (7) the State should have been required to secure Lori as a witness for a longer period of time; and (8) the court abused its discretion by not treating E.C. as a hostile witness.

Defendant complains that Lori used certain hand motions during her testimony and argues that the court's allowance of this constituted an

A-1903-20

endorsement of Lori's credibility. While Lori was testifying, defense counsel played a portion of her statement to police. During the statement, Lori stated defendant massaged her leg and she motioned with her hands towards the front of her pants. For clarification, Lori agreed that although she motioned toward the front of her pants, she was not indicating that defendant massaged the front of her body. In response to an objection, the court explained: "[Lori] had an opportunity to explain how and why she used the hand motions toward the front, which she did explain -- so it's not a contradictory statement, this court finds." Lori was seated when explaining how she was massaged; it would be difficult to demonstrate while seated how another person massaged the back of their legs. The court made a common-sense evidentiary ruling and overruled the objection. This allegation of contradictory testimony or judicial endorsement of a witness's credibility is unfounded.

During defendant's cross-examination, the prosecutor objected on two occasions to defendant looking to his attorney before answering questions. The court replied, "I'm not going to tell him where to look . . . but I'm watching . . . and I'm observing the testimony." Observing the defendant's testimony during a bench trial is hardly improper. Such observations are an important part of determining a witness's demeanor, which can often influence credibility

21

determinations. See Locurto, 157 N.J. at 474 ("credibility findings . . . are often influenced by matters such as observations of the character and demeanor of witnesses"). Neither the court's observations nor its comments evidenced any bias against defendant.

Defendant argues the trial court also showed bias towards him while ruling on his motion for a new trial. He asserts that the court improperly accused him of generically tailoring his testimony. We disagree. The tailoring accusation was specific to a set of facts that Lori and the defendant testified about differently. The court found defendant's testimony concerning the way Lori's pants were removed on December 30 to be "incredible." The court explained:

> In an effort to comport with her testimony, yet spin it to his favor, defendant seals his lack of veracity.
>
> According to defendant he begins to remove [Lori's] sweatpants and underwear during massage. [Lori] then turns on her left side in an effort to help defendant remove her pants.
>
> She then tries to grab her sweats with her right hand but couldn't reach so he removed the pants and underwear and placed them on the table. This doesn't make sense.
>
> If [Lori] wanted to take her pants off, it defies logic that she would put herself in a more difficult position to effectuate that result. If she wanted to take

> her pants off, she would have taken her pants off. Also, if she wanted defendant to touch her, why would she stay on her left side touching (sic) away from the defendant?
>
> What makes sense and what the [c]ourt finds credible is the detailed recollection of events testified to by [Lori].

The court did not state that defendant listened to the testimony given by the other witnesses and crafted his version to accommodate their testimony. The court essentially stated that defendant's testimony was fashioned to avoid some of the inconsistencies between his story and Lori's version. Notably, there were other factors which lent themselves to rejecting defendant's incredible version of the events. We find no impermissible accusation of generic tailoring.

Defendant argues the court was biased against him "in the manner the trial was conducted" because the court posed clarifying questions to Lori on two occasions about the same topic. While Lori was testifying about the penetrative act defendant committed against her, the court intervened and asked "How far did his finger go in? I'm sorry to be so crud[e]." Defendant argues that the prosecutor was about the ask the question next and without this interruption, "the information would have been placed into evidence without the unnecessary intervention of the court, exposing the court's bias."

A-1903-20

Judges are authorized to question witnesses. N.J.R.E. 614. A trial judge errs when her inquiries give the jury the impression that she takes one party's side or that she believes one version of an event and not another. State v. Taffaro, 195 N.J. 442, 451 (2008). In determining whether a judge erred in questioning a witness, we examine the record wholly and consider the impact of the court's questions. Id. at 454. This was a bench trial. Thus, there was no risk of influencing a jury. See State v. Ross, 229 N.J. 389, 408 (2017). Furthermore, the question was relevant. Sexual penetration is an element of sexual assault. N.J.S.A. 2C:14-2(c). Digital sexual penetration is defined as insertion of the finger into the anus or vagina. N.J.S.A. 2C:14-1(a). While the depth of insertion is not relevant, N.J.S.A. 2C:14-1(c), the question clarified whether penetration had in fact occurred because at an earlier point, defendant had testified that he "grazed" Lori's vagina with his hand. We discern no error or evidence of bias.

Defendant next argues that the court employed a preponderance of the evidence standard. He points to the court commenting during sentencing that Lori's testimony was more likely true than the defendant's testimony. We reject this argument. Defendant conflates comparing the relative credibility of witnesses with determining whether the State proved each element of the

24

offenses beyond a reasonable doubt. Comparing the credibility of witnesses who give different versions of critical facts is not improper; it is a basic part of determining the weight to be given to conflicting testimony.

Defendant argues that counsel wished to explore other issues with Lori and her girlfriend and the trial court's limiting of that testimony constituted an abuse of discretion. Essentially, counsel wished to explore more fully whether Lori consented to the touching of her CV1 spot.

As part of defendant's motion for a directed verdict or new trial, defense counsel indicated that he wanted to show Lori a diagram of the CV1 spot in acupuncture to see if it would change her testimony, thereby impacting her credibility. As the State explained in response, the defense was allowed "to challenge the veracity of [Lori] at length. She was actually on the stand for over two days . . . The victim was clear in her testimony. She did not consent." The court explained that the proposed line of questioning was irrelevant and that a proper foundation had been laid that Lori did not consent to the acts defendant committed against her on December 30. We discern no abuse of discretion.

Defendant claims the State should have been required to secure Lori as a witness for the time necessary for her to testify in full. He further claims the court should not have released Lori to leave New Jersey until her testimony was

25

completed. At the time of trial, Lori resided in Pittsburgh. The State contended that Lori was available and would have returned if necessary. We discern no deficiency by the State and no abuse of discretion by the court.

Defendant further claims the court erred by refusing to treat Lori's girlfriend, E.C., as a hostile witness. Defendant argues the court abused its discretion in precluding defense counsel from asking her leading questions during direct examination. Defendant asserts he should have been permitted to explore, through the E.C.'s testimony, what was said when Lori went to her house on December 30, "not for the purposes of hearsay" but "for the purposes of examining [] her credibility." The State noted that E.C. was not a fresh complaint witness. Therefore, any testimony regarding the conversation between Lori and E.C. was hearsay.

Our rules of evidence provide that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses . . . ." N.J.R.E. 611. The rule "is comparable to the broad discretion invested by the common law in trial judges to control the scope and mode of examination of witnesses, during both direct and cross-examination." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 to N.J.R.E. 611 (2021-2022); see e.g., Cestero v. Ferrara, 110 N.J. Super. 264, 273 (App. Div. 1970), aff'd, 57 N.J. 497 (1971).

Such discretion is specifically embedded in Rule 611(c) concerning leading questions:

> (c) Leading questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls an adverse party or a witness identified with an adverse party, or when a witness demonstrates hostility or unresponsiveness, interrogation may be by leading questions, subject to the discretion of the court.
>
> [N.J.R.E. 611(c).]

The court noted that E.C. responded to the defendant's subpoena to appear and testify at trial. It found that Lori's girlfriend "was not a hostile witness based on the totality of the factors." The court also found that cross-examination regarding what Lori told her girlfriend would be used for the truth of its contents and would be inadmissible hearsay. We agree. E.C.'s answers to defense counsel's questions were not evasive or non-responsive. Her testimony did not display the characteristics of a hostile witness. More fundamentally, defense counsel neither requested the court to declare E.C. a hostile witness, nor responded to the State's objections on that basis. We discern no abuse of discretion.

27

Finally, defendant argues that cumulative error requires a retrial. Our Supreme Court has "recognized . . . that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). Considering our analysis of the issues raised and ruling, defendant's cumulative error argument lacks merit. The alleged but unsubstantiated cumulative impact does not "cast sufficient doubt on [the] verdict to require reversal." Ibid.

V.

Defendant argues that his sentence was excessive, claiming that the record demonstrated that the mitigating factors substantially outweighed the aggravating factors, and he should have been sentenced in the third-degree range. We are unpersuaded.

Appellate courts review sentencing determinations deferentially. State v. Fuentes, 217 N.J. 57, 70 (2014). The reviewing court must not substitute its judgment for that of the sentencing court. Ibid. We affirm a sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the

sentence clearly unreasonable so as to shock the judicial conscience."

> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

The court found that the mitigating factors slightly outweighed the aggravating factors. Defendant was sentenced to the bottom of the second-degree range on the sexual assault count and received a concurrent term on the sexual contact term. Therefore, the only mechanism to impose a shorter term of imprisonment would be to downgrade the offense one degree lower for sentencing purposes pursuant to N.J.S.A. 2C:44-1(f)(2).

A sentencing downgrade under N.J.S.A. 2C:44-1(f)(2) is appropriate only if "the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands" the downgrade. See also State v. Megargel, 143 N.J. 484, 496 (1996); State v. L.V., 410 N.J. Super. 90, 112-13 (App. Div. 2009). "[T]he court must find that there are 'compelling' reasons 'in addition to, and separate from,' the mitigating factors, which require the downgrade in the interest of justice." State v. Locane, 454 N.J. Super. 98, 121 (App. Div. 2018) (quoting State v. Jones, 197 N.J. Super. 604, 607 (App. Div. 1984)); see also Megargel, 143 N.J. at 505; L.V., 410 N.J. Super. at 112-13. "The interest of justice analysis does not include consideration

of defendant's overall character or contributions to the community." Locane, 454 N.J. Super. at 122 (citing State v. Lake, 408 N.J. Super. 313, 328-29 (App. Div. 2009)).

"The focus remains on the crime, as the downgrade statute 'is an offense-oriented provision.'" Id. at 121 (quoting Lake, 408 N.J. Super. at 328). "The paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protection and the more need for deterrence." Id. at 122 (quoting Megargel, 143 N.J. at 500). In deciding whether to downgrade an offense, the court should consider the degree of the crime, whether the surrounding circumstances make the offense similar to one of a lesser degree, and defendant's characteristics as they relate to the offense. Megargel, 143 N.J. at 500-01; State v. Rice, 425 N.J. Super. 375, 384 (App. Div. 2012). The severity of the crime is the most important factor. Megargel, 143 N.J. at 500. "Where the crime includes an enhanced penalty, . . . 'trial courts must exercise extreme caution[]' before ordering a downgrade." Locane, 454 N.J. Super. at 122 (second alteration in original) (quoting Mergergel, 143 N.J. at 502). See also Cannel, N.J. Criminal Code Annotated, cmt. 10 on N.J.S.A. 2C:44-1 (2021) ("A court should sentence to one degree lower only where the

'interest of justice' so requires, and it should be reluctant for crimes so serious that they carry sentences higher than those normal for the degree of crime." (citing State v. Mirakaj, 268 N.J. Super. 48 (App. Div. 1993))). The "interests of justice" did not require sentencing defendant one degree lower.

Moreover, where the Legislature has provided an enhanced penalty for an offense, "the downgrade of that offense requires more compelling reasons than the downgrade of an offense for which the Legislature has not attached an enhanced penalty." Rice, 425 N.J. Super. at 385 (quoting Megargel, 143 N.J. at 502). A sentencing court should not use its discretion to circumvent the legislative design. State v. Lopez, 395 N.J. Super. 98, 108-09 (App. Div. 2007). Sexual assault is a serious crime. The Legislature subjected second-degree sexual assault to the parole ineligibility and mandatory parole supervision under NERA, the registration requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23, and parole supervision for life, N.J.S.A. 2C:43-6.4.

Here, the judge rejected the defendant's contention that the mitigating factors substantially outweighed the aggravating factors. The record supports that finding. We discern no abuse of discretion. The interests of justice did not demand a sentencing downgrade. Accordingly, sentencing the sexual assault in

the second-degree range was appropriate. The sentence is neither manifestly excessive nor unduly punitive and does not shock the judicial conscience.

## VI.

Finally, we address defendant's argument that the sexual contact conviction should have been merged into the sexual assault conviction.

N.J.S.A. 2C:14-2(c)(1) provides:

> c. An actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:
>
> (1) The actor commits the act using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury;

In turn, N.J.S.A. 2C:14-3(b) provides: "An actor is guilty of criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in section 2C:14-2(c)(1) through (5)." Only subsection (c)(1) is relevant to this case.

"Merger stems from the well-settled principle that 'an accused [who] has committed only one offense . . . cannot be punished as if for two.'" State v. Cole, 120 N.J. 321, 326 (1990) (alteration in original) (quoting State v. Miller, 108 N.J. 112, 116 (1987)). Merger of convictions ensures that a defendant will avoid

32

"double punishment for a single wrongdoing." State v. Diaz, 144 N.J. 628, 637 (1996).

New Jersey courts eschew "technisms and inflexibility" when resolving merger issues. Cole, 120 N.J. at 326. Rather, merger analysis focuses on the elements of the crime and the Legislature's intent in creating them, and the facts of each case. Id. at 327. The specific elements of the offenses must be considered in light of N.J.S.A. 2C:1-8(a)(4), which defines when conduct constitutes more than one offense. Cole, 120 N.J. at 327-28. Thus, courts consider

> the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed.
>
> [State v. Davis, 68 N.J. 69, 81 (1975).]

Thus, merger may be appropriate even where a single course of conduct constitutes a violation of two different criminal statutes. State v. Miller, 108 N.J. 112, 118 (1987). Our case law "emphasize[s] the importance of considering the facts and the status of the victim in deciding merger." State v. Adams, 227 N.J. Super. 51, 62 (App. Div. 1988).

During oral argument before this court, the State contended that the act giving rise to the criminal sexual contact charge was defendant's touching of Lori's breasts, which occurred prior to the penetrative sexual assault.[2] Defendant contends that the State did not provide evidence to the grand jury of defendant's touching of the victim's breast during an incident separate from the sexual assault incident. The trial court ruled that defendant did not receive adequate notice of the breast touching as the act of the criminal sexual contact. The State agreed with that limitation and did not cross-appeal from that ruling. We therefore do not consider the touching of the victim's breasts in our merger analysis.

Considering the <u>Davis</u> factors, we note that defendant first inserted his hands under Lori's sweatpants and rubbed near her vagina above her underwear. Shortly thereafter, during the same incident, defendant removed her sweatpants and underwear and licked and digitally penetrated her vagina. Penetration was an element of the sexual assault but not the criminal sexual contact. The initial touching of the victim's vagina occurred before her sweatpants and underwear were removed. It satisfied the elements of criminal sexual contact. It did not satisfy the penetration element of second-degree sexual assault.

---

[2] The State's brief did not address the merger issue.

In State v. Adams, the court reasoned that the defendant should not be allowed the free crime of burglary simply because his attack escalated to attempted aggravated sexual assault. 227 N.J. Super. 51, 62 (App. Div. 1988). The Adams court recognized, however, that it was "a close question whether the criminal sexual contact conviction should merge with the attempted aggravated sexual assault conviction." Id. at 67. The court explained:

> The criminal sexual contact conviction was based upon defendant's fondling of the victim's breasts and genital area in addition to the physical abuse he inflicted upon her. The facts supporting each of these offenses are different in this case. Hence, merger of the fourth degree criminal sexual contact conviction into the second degree attempted aggravated sexual assault conviction would not be warranted.
>
> [Id. at 68.]

Guided by these principles, we conclude that merger of the criminal sexual contact conviction into the sexual assault conviction was warranted. The controlling facts in Adams are distinguishable. Here, the offenses occurred in a continuous sequence during a single episode, involved improperly touching the same body part, and quickly escalated into the sexual assault. Accordingly, we vacate defendant's sentence on count two and remand for entry of a corrected judgment of conviction stating that count two is merged into count one and deleting defendant's sentence and assessments on count two.

A-1903-20

Affirmed in part, vacated in part, and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1903-20